**ITAR–TASS RUSSIAN NEWS AGENCY; Itar–Tass USA, and Fromer & Associates, Inc., Plaintiffs–Counter–Defendants–Appellees,**

**Argumenty I Fakty; Moskowskie Novosti Komsomolskaya Pravda; Union of Journalists of Russia; Ekho Planety; Megapolis Express; Balagan Israelicomic Magazine; Moskowsky Komsomolets; AR Publishing Co., Inc. and Yevgen I. Fromer, Plaintiffs–Appellees,**

v.

**RUSSIAN KURIER, INC., Defendant–Counter–Claimant–Appellant,**

Oleg Pogrebnoy, Defendant–Appellant.

Docket No. 97–7498.

United States Court of Appeals,
Second Circuit.

Argued Dec. 17, 1997.
Decided Aug. 27, 1998.

Joel K. Bohmart, Bohmart & Sacks, New York City, for appellants.

Robert J. Berman, Hackensack, N.J., for appellee Fromer and Associates.

Julian Lowenfeld, New York City, for remaining appellees.

(Professor William F. Patry, Yeshiva University, Benjamin N. Cardozo School of Law, New York City, submitted a brief as amicus curiae, by appointment of the Court).

Before: FEINBERG, NEWMAN,* and McLAUGHLIN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal primarily presents issues concerning the choice of law in international copyright cases and the substantive meaning of Russian copyright law as to the respective rights of newspaper reporters and newspaper publishers. The conflicts issue is which country's law applies to issues of copyright ownership and to issues of infringement. The primary substantive issue under Russian copyright law is whether a newspaper publishing company has an interest sufficient to give it standing to sue for copying the text of individual articles appearing in its newspapers, or whether complaint about such copying may be made only by the reporters who authored the articles. Defendants-appellants Russian Kurier, Inc. ("Kurier") and Oleg Pogrebnoy (collectively "the Kurier defendants") appeal from the March 25, 1997, judgment of the District Court for the Southern District of New York (John G. Koeltl, Judge) enjoining them from copying articles that have appeared or will appear in publications of the plaintiffs-appellees, mainly Russian newspapers and a Russian news agency, and awarding the appellees substantial damages for copyright infringement.

On the conflicts issue, we conclude that, with respect to the Russian plaintiffs, Russian law determines the ownership and essential nature of the copyrights alleged to have been infringed and that United States law determines whether those copyrights have been infringed in the United States and, if so, what remedies are available. We also conclude that Russian law, which explicitly excludes newspapers from a work-for-hire doctrine, vests exclusive ownership interests in newspaper articles in the journalists who wrote the articles, not in the newspaper employers who compile their writings. We further conclude that to the extent that Russian law accords newspaper publishers an interest distinct from the copyright of the newspaper reporters, the publishers' inter-

est, like the usual ownership interest in a compilation, extends to the publishers' original selection and arrangement of the articles, and does not entitle the publishers to damages for copying the texts of articles contained in a newspaper compilation. We therefore reverse the judgment to the extent that it granted the newspapers relief for copying the texts of the articles. However, because one non-newspaper plaintiff-appellee is entitled to some injunctive relief and damages and other plaintiffs-appellees may be entitled to some, perhaps considerable, relief, we also remand for further consideration of this lawsuit.

## Background

The lawsuit concerns *Kurier*, a Russian language weekly newspaper with a circulation in the New York area of about 20,000. It is published in New York City by defendant Kurier. Defendant Pogrebnoy is president and sole shareholder of Kurier and editor-in-chief of *Kurier*. The plaintiffs include corporations that publish, daily or weekly, major Russian language newspapers in Russia and Russian language magazines in Russia or Israel; Itar–Tass Russian News Agency ("Itar–Tass"), formerly known as the Telegraph Agency of the Soviet Union (TASS), a wire service and news gathering company centered in Moscow, functioning similarly to the Associated Press; and the Union of Journalists of Russia ("UJR"), the professional writers union of accredited print and broadcast journalists of the Russian Federation.

The Kurier defendants do not dispute that *Kurier* has copied about 500 articles that first appeared in the plaintiffs' publications or were distributed by Itar–Tass. The copied material, though extensive, was a small percentage of the total number of articles published in *Kurier*. See *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, No. 95 Civ. 2144(JGK), 1997 WL 109481, at *13 (S.D.N.Y. Mar. 10, 1997) ("*Itar–Tass II* "). The Kurier defendants also do not dispute how the copying occurred: articles from the

---

* Judge Calabresi was originally a member of the panel, but recused himself after oral argument. Thereafter, Judge Newman was assigned to the

panel and has heard the audiotapes of the oral argument.

plaintiffs' publications, sometimes containing headlines, pictures, bylines, and graphics, in addition to text, were cut out, pasted on layout sheets, and sent to *Kurier*'s printer for photographic reproduction and printing in the pages of *Kurier*.

Most significantly, the Kurier defendants also do not dispute that, with one exception, they had not obtained permission from any of the plaintiffs to copy the articles that appeared in *Kurier*. Pogrebnoy claimed at trial to have received permission from the publisher of one newspaper, but his claim was rejected by the District Court at trial. *See id.* at *4. Pogrebnoy also claimed that he had obtained permission from the authors of six of the copied articles. The District Court made no finding as to whether this testimony was credible, since authors' permission was not pertinent to the District Court's view of the legal issues.

*Preliminary injunction ruling.* After a hearing in May 1995, the District Court issued a preliminary injunction, prohibiting the Kurier defendants from copying the "works" of four plaintiff news organizations. *See ITAR–TASS Russian News Agency v. Russion Kurier Inc.*, 886 F.Supp. 1120, 1131 (S.D.N.Y.1995) ("*Itar–Tass I*"). Since the Court's analysis framed the key issue that would be considered at trial and is raised on appeal, the Court's opinion and the Russian statutory provisions relied on need to be explained.

Preliminarily, the Court ruled that the request for a preliminary injunction concerned articles published after March 13, 1995, the date that Russia acceded to the Berne Convention. *See id.* at 1125. The Court then ruled that the copied works were "Berne Convention work[s]," 17 U.S.C. § 101, and that the plaintiffs' rights were to be determined according to Russian copyright law. *See Itar–Tass I,* 886 F.Supp. at 1125–26.

The Court noted that under Russian copyright law authors of newspaper articles retain the copyright in their articles unless there has been a contractual assignment to their employer or some specific provision of law provides that the author's rights vest in the employer. *See id.* at 1127. Since the defendants alleged no claim of a contractual assignment, the Court next considered the provision of the 1993 Russian Federation Law on Copyright and Neighboring Rights ("Russian Copyright Law") (World Intellectual Property Organization (WIPO) translation) concerning what the United States Copyrights Act calls "works made for hire," 17 U.S.C. § 201(b). *See* Russian Copyright Law, Art. 14(2). That provision gives employers the exclusive right to "exploit" the "service-related work" produced by employees in the scope of their employment, absent some contractual arrangement. However, the Court noted, Article 14(4) specifies that subsection 2 does not apply to various categories of works, including newspapers. *See Itar–Tass I,* 886 F.Supp. at 1127. Accepting the view of plaintiffs' expert, Professor Vratislav Pechota, Judge Koeltl therefore ruled that the Russian version of the work-for-hire doctrine in Article 14(2), though exempting newspapers, applies to press agencies, like Itar–Tass. *See id.*

Turning to the rights of the newspapers, Judge Koeltl relied on Article 11, captioned "Copyright of Compiler, of Collections and Other Works." This Article contains two subsections. Article 11(1) specifies the rights of compilers generally:

> The author of a collection or any other composite work (compiler) shall enjoy copyright in the selection or arrangement of subject matter that he has made insofar as that selection or arrangement is the result of a creative effort of compilation.
>
> The compiler shall enjoy copyright subject to respect for the rights of the authors of each work included in the composite work.
>
> Each of the authors of the works included in the composite work shall have the right to exploit his own work independently of the composite work unless the author's contract provides otherwise.
>
> . . . .

Russian Copyright Law, Art. 11(1). Article 11(2), the interpretation of which is critical to this appeal, specifies the rights of compilers of those works that are excluded from the work-for-hire provision of Article 14(2):

The exclusive right to exploit encyclopedias, encyclopedic dictionaries, collections of scientific works—published in either one or several installments—newspapers, reviews and other periodical publications shall belong to the editor[1] thereof. The editor shall have the right to mention his name or to demand such mention whenever the said publications are exploited.

The authors of the works included in the said publications shall retain the exclusive rights to exploit their works independently of the publication of the whole work.

*Id.*, Art. 11(2). In another translation of the Russian Copyright Law, which was in evidence at the trial, the last phrase of Article 11(2) was rendered "independently from the publication as a whole." Russian Copyright Law, Art. 11(2) (Newton Davis translation). Because the parties' experts focused on the phrase "as a whole" in the Davis translation of Article 11(2), we will rely on the Davis translation for the rendering of this key phrase of Article 11(2), but all other references to the Russian Copyright Law will be to the WIPO translation.

The District Court acknowledged, as the plaintiffs' expert had stated, that considerable scholarly debate existed in Russia as to the nature of a publisher's right "in a work as a whole." *See Itar–Tass I,* 886 F.Supp. at 1128. Judge Koeltl accepted Professor Pechota's view that the newspaper could prevent infringing activity "sufficient to interfere with the publisher's interest in the integrity of the work." *Id.* Without endeavoring to determine what extent of copying would "interfere with" the "integrity of the work," Judge Koeltl concluded that a preliminary injunction was warranted because what *Kurier* had copied was "the creative effort of the newspapers in the compilation of articles including numerous articles for the same issues, together with headlines and photographs." *Id.* The Court's preliminary injunction opinion left it unclear whether at trial the plaintiffs could obtain damages only for copying the newspapers' creative efforts as a compiler, such as the selection and arrangement of articles, the creation of headlines, and the layout of text and graphics, or also for copying the text of individual articles.

*Expert testimony at trial.* At trial, this unresolved issue was the focus of conflicting expert testimony. The plaintiffs' expert witness at trial was Michael Newcity, coordinator for the Center for Slavic, Eurasian and East European Studies at Duke University and an adjunct member of the faculty at the Duke University Law School. He opined that Article 11(2) gave the newspapers rights to redress copying not only of the publication "as a whole," but also of individual articles. He acknowledged that the reporters retained copyrights in the articles that they authored, but stated that Article 11(2) created a regime of parallel exclusive rights in both the newspaper publisher and the reporter. He rejected the contention that exclusive rights could not exist in two parties, pointing out that co-authors share exclusive rights to their joint work.

Newcity offered two considerations in support of his position. First, he cited the predecessor of Article 11(2), Article 485 of the Russian Civil Code of 1964. That provision was similar to Article 11(2), with one change that became the subject of major disagreement among the expert witnesses. Article 485 had given compilers, including newspaper publishers, the right to exploit their works "as a whole." The 1993 revision deleted "as a whole" from the first paragraph of the predecessor of Article 11(2), where it had modified the scope of the compiler's right, and moved the phrase to the second paragraph of revised Article 11(2), where it modifies the reserved right of the authors of articles within a compilation to exploit their works "independently of the publication as a whole."

Though Newcity opined that even under Article 485, reprinting of "one or two or three, at most," articles from a newspaper would have constituted infringement of the copyright "as a whole," he rested his reading of Article 11(2) significantly on the fact that the 1993 revision dropped the phrase "as a whole" from the paragraph that specified the publisher's right. This deletion, he contend-

1. The Newton Davis translation, which was an exhibit at trial, renders this word "publisher."

ed, eliminated whatever ambiguity might have existed in the first paragraph of Article 485.

Second, Newcity referred to an opinion of the Judicial Chamber for Informational Disputes of the President of the Russian Federation ("Informational Disputes Chamber"), issued on June 8, 1995. That opinion had been sought by the editor-in-chief of one of the plaintiffs in this litigation, *Moskovskie Novosti* (*Moscow News*), who specifically called the tribunal's attention to the pending litigation between Russian media organizations and the publisher of *Kurier*. The Informational Disputes Chamber stated, in response to one of the questions put to it,[2] "In the event of a violation of its rights, including the improper printing of one or two articles, the publisher [of a newspaper] has the right to petition a court for defense of its rights."

Defendants' experts presented a very different view of the rights of newspapers. Professor Peter B. Maggs of the University of Illinois, Urbana–Champaign, College of Law, testifying by deposition, pointed out that Article 11(2) gives authors the exclusive rights to their articles and accords newspaper publishers only the "exclusive rights to the publication as a whole, because that's the only thing not reserved to the authors." He opined that a newspaper's right to use of the compiled work "as a whole" would be infringed by the copying of an entire issue of a newspaper and probably by copying a substantial part of one issue, but not by the copying of a few articles, since the copyright in the articles belongs to the reporters. He also disagreed with Newcity's contention that exclusive rights to individual articles belonged simultaneously to both the newspaper and the reporter. Exclusive rights, he maintained, cannot be held by two people, except in the case of co-authors, who have jointly held rights against the world.

The defendants' first expert witness at trial was Michael Solton, who has worked in Moscow and Washington as an associate of the Steptoe & Johnson law firm. Under Article 11, he testified, authors retain exclusive rights to their articles in compilations, the compiler acquires a copyright in the selection and creative arrangement of materials in the compilation, and a newspaper publisher typically acquires the limited rights of the compiler by assignment from the compiler. The publisher, he said, does not acquire any rights to the individual articles. Solton declined to attach any significance to the decision issued by the Informational Disputes Chamber because, he explained, the bylaws of that body accord it authority only over limited matters concerning the mass media and explicitly preclude it from adjudicating matters that Russian law refers to courts of the Russian Federation, such as copyright law.

The defendants' second expert trial witness was Svetlana Rozina, a partner of the Lex International law firm, who has consulted for the Russian government. She wrote the first draft of what became the 1993 revision of the Russian Copyright Law. She also testified that authors of works in compilations retain the exclusive right to their works, and that publishers of compilations do not have any rights to individual articles. Turning to the change in the placement of the phrase "as a whole" from Article 11(1) to Article 11(2), she explained that no substantive change was intended; the shift was made "[f]or the purpose of Russian grammar." She also agreed with Solton that the Informational Disputes Chamber renders advice on matters concerning freedom of mass information and lacks the competence to adjudicate issues of copyright law.

*Trial ruling.* The District Court resolved the dispute among the experts by accepting Newcity's interpretation of Russian copyright law. *See Itar–Tass II*, 1997 WL 109481, at *9–*10. As he had previously ruled in granting the preliminary injunction, Judge Koeltl recognized that newspapers acquire no rights to individual articles by virtue of Article 14 since the Russian version of the

---

**2.** The question posed was:

Under Russian jurisprudence, must the newspaper be completely copied by infringers of copyright in order for the publisher to have standing to come to court, or does the publisher have the right to come to court even in the case where the copyrights have been infringed by means of a reprint of just one or two articles by third parties (infringers)?

work-for-hire doctrine is inapplicable to newspapers. Nevertheless, Judge Koeltl accepted Newcity's view of Article 11, relying on both the movement of the phrase "as a whole" from the first paragraph of Article 11(2) to the second paragraph of Article 11(2), and the opinion of the Informational Disputes Chamber. He also reasoned that publishers have "the real economic incentive to prevent wholesale unauthorized copying," and that, in the absence of assignments of rights to individual articles, widespread copying would occur if publishers could not prevent *Kurier*'s infringements. *Itar–Tass II*, 1997 WL 109481, at *10.

The District Court estimated *Kurier*'s profits during the relevant years at $2 million and found that 25 percent of these profits were attributable to the copied articles. The Court therefore awarded the plaintiffs $500,-000 in actual damages against Kurier and Pogrebnoy. *See id.* at *14. The Court also ruled that the plaintiffs were entitled to statutory damages with respect to 28 articles for which the plaintiffs had obtained United States copyright registrations. *See id.* at *15. The Court found that the registered articles had originally appeared in 15 different publications and concluded that the plaintiffs were entitled to 15 awards of statutory damages. *See id.* at *16. The Court found the violations willful, *see* 17 U.S.C. § 504(c)(1), and set each statutory award at $2,700. *See Itar–Tass II*, 1997 WL 109481, at *16. However, to avoid duplicative recovery, the Court ruled that the actual and statutory damages could not be aggregated and afforded the plaintiffs their choice of whether to receive statutory damages (offsetting the statutory award from the actual damages award) or actual damages. The

Court awarded $3,934 in total damages against defendant Linco Printing, which prints *Kurier*; this sum comprised actual damages of $1,017, reduced to $934 to avoid partial duplication with statutory damages, plus $3,000 in statutory damages. *See id.* at *17.

## Discussion

### I. Choice of Law

The threshold issue concerns the choice of law for resolution of this dispute. That issue was not initially considered by the parties, all of whom turned directly to Russian law for resolution of the case. Believing that the conflicts issue merited consideration, we requested supplemental briefs from the parties and appointed Professor William F. Patry as Amicus Curiae.[3] Prof. Patry has submitted an extremely helpful brief on the choice of law issue.

Choice of law issues in international copyright cases have been largely ignored in the reported decisions and dealt with rather cursorily by most commentators. Examples pertinent to the pending appeal are those decisions involving a work created by the employee of a foreign corporation. Several courts have applied the United States work-for-hire doctrine, *see* 17 U.S.C. § 201(b), without explicit consideration of the conflicts issue. *See, e.g., Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548, 551–53 (2d Cir. 1984) (U.S. law applied to determine if statuettes crafted abroad were works for hire);[4] *Dae Han Video Productions, Inc. v. Kuk Dong Oriental Food, Inc.*, 19 U.S.P.Q.2d 1294 (D.Md.1990) (U.S. law applied to determine if scripts written abroad were works for

---

3. Prof. Patry, a faculty member at Cardozo Law School, has served as Adviser to the Register of Copyrights and Counsel to the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary of the U.S. House of Representatives. He is the author of well known treatises on copyright law. *See* William F. Patry, *Copyright Law and Practice* (1994); William F. Patry, *The Fair Use Privilege in Copyright Law* (2d ed. 1995).

4. Though *Aldon's* use of the "actual supervision and control" test for applying the work-for-hire doctrine has since been rejected, *see Community*

*for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), its use of U.S. law as the source of the work-for-hire doctrine remains unimpaired, though the precedential force of the implicit conflicts ruling is weakened by the absence of any discussion of the issue. Under principles we discuss below, United States law was properly applied to the ownership issue since the country of origin of the work was the United States, the work having been first published in the United States and "authored" by a U.S. citizen.

hire);[5] *P & D International v. Halsey Publishing Co.*, 672 F.Supp. 1429, 1435–36 (S.D.Fla.1987) (U.S. work-for-hire law assumed to apply). Other courts have applied foreign law. *See Frink America, Inc. v. Champion Road Machinery Ltd.*, 961 F.Supp. 398 (N.D.N.Y.1997) (Canadian copyright law applied on issue of ownership); *Greenwich Film Productions v. DRG Drugs Inc.*, 1992 WL 279357 (S.D.N.Y. Sept. 25, 1992) (French law applied to determine ownership of right to musical work commissioned in France for French film); *Dae Han Video Production Inc. v. Doug San Chun*, 17 U.S.P.Q.2d 1306, 1310 n. 6, 1990 WL 265976 (E.D.Va. June 18, 1990) (foreign law relied on to determine that alleged licensor lacks rights); *see also Autoskill, Inc. v. National Educational Support Systems, Inc.*, 994 F.2d 1476, 1489 n. 16 (10th Cir.1993) (U.S. work-for-hire law applied where claim that contrary Canadian law should apply was belatedly raised and for that reason not considered); *Pepe (U.K.) Ltd. v. Grupo Pepe Ltda.*, 24 U.S.P.Q.2d 1354, 1356 (S.D.Fla.1992) (congruent foreign and U.S. law both applied). In none of these cases, however, was the issue of choice of law explicitly adjudicated. The conflicts issue was identified but ruled not necessary to be resolved in *Greenwich Film Productions S.A. v. D.R.G. Drugs, Inc.*, 25 U.S.P.Q.2d 1435, 1437–38 (S.D.N.Y.1992).

■ The Nimmer treatise briefly (and perhaps optimistically) suggests that conflicts issues "have rarely proved troublesome in the law of copyright." *Nimmer on Copyright* § 17.05 (1998) (*"Nimmer"*) (footnote omitted). Relying on the "national treatment" principle of the Berne Convention[6]

and the Universal Copyright Convention[7] ("U.C.C."), *Nimmer* asserts, correctly in our view, that "an author who is a national of one of the member states of either Berne or the U.C.C., or one who first publishes his work in any such member state, is entitled to the same copyright protection in each other member state as such other state accords to its own nationals." *Id.* (footnotes omitted). *Nimmer* then somewhat overstates the national treatment principle: "The applicable law is the copyright law of the state in which the infringement occurred, not that of the state of which the author is a national, or in which the work is first published." *Id.* (footnote omitted). The difficulty with this broad statement is that it subsumes under the phrase "applicable law" the law concerning two distinct issues—ownership and substantive rights, *i.e.*, scope of protection.[8] Another commentator has also broadly stated the principle of national treatment, but described its application in a way that does not necessarily cover issues of ownership. "The principle of national treatment also means that both the question of whether the right exists and the question of the scope of the right are to be answered in accordance with the law of the country where the protection is claimed." S.M. Stewart, *International Copyright and Neighboring Rights* § 3.17 (2d ed. 1989). We agree with the view of the Amicus that the Convention's principle of national treatment simply assures that if the law of the country of infringement applies to the scope of substantive copyright protection, that law will be applied uniformly to foreign and domestic authors. *See Murray v. British*

5. To the extent that this decision applied the U.S. work-for-hire doctrine simply because copyright certificates had been issued by the United States Copyright Office, it relied on an unpersuasive ground. Issuance of the certificate is not a determination concerning applicability of the work-for-hire doctrine or a resolution of any issue concerning ownership. *See* Jane C. Ginsburg, *Ownership of Electronic Rights and the Private International Law of Copyright*, 22 Colum.–VLA J.L. & Arts 165, 171 n. 22 (1998).

6. *See* Berne Convention Art. 5(1) (Paris text 1971), *reprinted in* 3 William F. Patry, *Copyright Law and Practice* 2013 (1994).

7. *See* Universal Copyright Convention (Paris text 1971), *reprinted in* 3 William F. Patry, *Copyright Law and Practice* 2054 (1994).

8. Prof. Patry's brief, as Amicus Curiae, helpfully points out that the principle of national treatment is really not a conflicts rule at all; it does not direct application of the law of any country. It simply requires that the country in which protection is claimed must treat foreign and domestic authors alike. Whether U.S. copyright law directs U.S. courts to look to foreign or domestic law as to certain issues is irrelevant to national treatment, so long as the scope of protection would be extended equally to foreign and domestic authors.

*Broadcasting Corp.*, 906 F.Supp. 858 (S.D.N.Y.1995), aff'd, 81 F.3d 287 (1996).

*Source of conflicts rules.* Our analysis of the conflicts issue begins with consideration of the source of law for selecting a conflicts rule. Though *Nimmer* turns directly to the Berne Convention and the U.C.C., we think that step moves too quickly past the Berne Convention Implementation Act of 1988, Pub. L. 100–568, 102 Stat. 2853, 17 U.S.C. § 101 note. Section 4(a)(3) of the Act amends Title 17 to provide: "No right or interest in a work eligible for protection under this title may be claimed by virtue of ... the provisions of the Berne Convention.... Any rights in a work eligible for protection under this title that derive from this title ... shall not be expanded or reduced by virtue of ... the provisions of the Berne Convention."[9] 17 U.S.C. § 104(c).

We start our analysis with the Copyrights Act itself, which contains no provision relevant to the pending case concerning conflicts issues.[10] We therefore fill the interstices of the Act by developing federal common law on the conflicts issue. *See D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); *id.* at 472, 62 S.Ct. 676 (Jackson, J., concurring) ("The law which we apply to this case consists of principles of established credit in jurisprudence, selected by us because they are appropriate to effectuate the policy of the governing Act."). In doing so, we are entitled to consider and apply principles of private international law, which are " 'part of our law.' " *Maxwell*

Communication Corp. v. Societe Generale, 93 F.3d 1036, 1047 (2d Cir.1996) (quoting *Hilton v. Guyot*, 159 U.S. 113, 143, 16 S.Ct. 139, 40 L.Ed. 95 (1895)).

The choice of law applicable to the pending case is not necessarily the same for all issues. *See* Restatement (Second) of Conflict of Laws § 222 ("The courts have long recognized that they are not bound to decide all issues under the local law of a single state."). We consider first the law applicable to the issue of copyright ownership.

■ *Conflicts rule for issues of ownership.* Copyright is a form of property, and the usual rule is that the interests of the parties in property are determined by the law of the state with "the most significant relationship" to the property and the parties. *See id.* The Restatement recognizes the applicability of this principle to intangibles such as "a literary idea." *Id.* Since the works at issue were created by Russian nationals and first published in Russia, Russian law is the appropriate source of law to determine issues of ownership of rights. That is the well-reasoned conclusion of the Amicus Curiae, Prof. Patry, and the parties in their supplemental briefs are in agreement on this point. In terms of the United States Copyrights Act and its reference to the Berne Convention, Russia is the "country of origin" of these works, *see* ·17 U.S.C. § 101 (definition of "country of origin" of Berne Convention work); Berne Convention, Art. 5(4), although "country of origin" might not always be the

---

**9.** Other pertinent provisions are:

> Section 2(2), which provides: "The obligations of the United States under the Berne Convention may be performed only pursuant to appropriate domestic law."
> Section 3(a)(2), which provides: "The provisions of the Berne Convention ... shall not be enforceable in any action brought pursuant to the provisions of the Berne Convention itself."
> Section 3(b)(1), which provides: "The provisions of the Berne Convention ... do not expand or reduce the right of any author of a work, whether claimed under Federal, State, or the common law ... to claim authorship of the work."

**10.** The recently added provision concerning copyright in "restored works," those that are in the public domain because of noncompliance

with formalities of United States copyright law, contains an explicit subsection vesting ownership of a restored work "in the author or initial rightholder of the work *as determined by the law of the source country of the work.*" 17 U.S.C. § 104A(b) (emphasis added); *see id.* § 104A(h)(8) (defining "source country").

This provision could be interpreted to be an example of the general conflicts approach we take in this opinion to copyright ownership issues, or an exception to some different approach. *See* Jane C. Ginsburg, *Ownership of Electronic Rights and the Private International Law of Copyright*, 22 Colum.–VLA J.L. & Arts 165, 171 (1998). We agree with Prof. Ginsburg and with the amicus, Prof. Patry, that section 104A(b) should not be understood to state an exception to any otherwise applicable conflicts rule. *See* Ginsburg, *id.;* Brief for Amicus Curiae at 14–17.

appropriate country for purposes of choice of law concerning ownership.[11]

To whatever extent we look to the Berne Convention itself as guidance in the development of federal common law on the conflicts issue, we find nothing to alter our conclusion. The Convention does not purport to settle issues of ownership, with one exception not relevant to this case.[12] *See* Jane C. Ginsburg, *Ownership of Electronic Rights and the Private International Law of Copyright*, 22 Colum.–VLA J.L. & Arts 165, 167–68 (1998) (The Berne Convention "provides that the law of the country where protection is claimed defines what rights are protected, the scope of the protection, and the available remedies; the treaty does not supply a choice of law rule for determining ownership.") (footnote concerning Art. 14*bis* (2)(a) omitted).

■ Selection of Russian law to determine copyright ownership is, however, subject to one procedural qualification. Under United States law, an owner (including one determined according to foreign law) may sue for infringement in a United States court only if it meets the standing test of 17 U.S.C. § 501(b), which accords standing only to the legal or beneficial owner of an "exclusive right."

■ *Conflicts rule for infringement issues.* On infringement issues, the governing conflicts principle is usually *lex loci delicti*, the doctrine generally applicable to torts. *See Lauritzen v. Larsen*, 345 U.S. 571, 583, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). We have implicitly adopted that approach to infringement claims, applying United States copyright law to a work that was unprotected in its country of origin. *See Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192–

93 (2d Cir.1985). In the pending case, the place of the tort is plainly the United States. To whatever extent *lex loci delicti* is to be considered only one part of a broader "interest" approach, *see Carbotrade S.p.A. v. Bureau Veritas*, 99 F.3d 86, 89–90 (2d Cir.1996), United States law would still apply to infringement issues, since not only is this country the place of the tort, but also the defendant is a United States corporation.

The division of issues, for conflicts purposes, between ownership and infringement issues will not always be as easily made as the above discussion implies. If the issue is the relatively straightforward one of which of two contending parties owns a copyright, the issue is unquestionably an ownership issue, and the law of the country with the closest relationship to the work will apply to settle the ownership dispute. But in some cases, including the pending one, the issue is not simply who owns the copyright but also what is the nature of the ownership interest. Yet as a court considers the nature of an ownership interest, there is some risk that it will too readily shift the inquiry over to the issue of whether an alleged copy has infringed the asserted copyright. Whether a copy infringes depends in part on the scope of the interest of the copyright owner. Nevertheless, though the issues are related, the nature of a copyright interest is an issue distinct from the issue of whether the copyright has been infringed. *See, e.g., Kregos v. Associated Press*, 937 F.2d 700, 709–10 (2d Cir. 1991) (pointing out that although work survives summary judgment on issue of copyrightability of compilation, scope of protection against claim of infringement might be limited). The pending case is one that requires consideration not simply of who owns

---

11. In deciding that the law of the country of origin determines the ownership of copyright, we consider only initial ownership, and have no occasion to consider choice of law issues concerning assignments of rights.

12. The Berne Convention expressly provides that "[o]wnership of copyright in a cinematographic work shall be a matter for legislation in the country where protection is claimed." Berne Convention, Art. 14*bis* (2)(a). With respect to other works, this provision could be understood to have any of three meanings. First, it could

carry a negative implication that for other works, ownership is not to be determined by legislation in the country where protection is claimed. Second, it could be thought of as an explicit assertion for films of a general principle already applicable to other works. Third, it could be a specific provision for films that was adopted without an intention to imply anything about other works. In the absence of any indication that either the first or second meanings were intended, we prefer the third understanding.

an interest, but, as to the newspapers, the nature of the interest that is owned.

## II. Determination of Ownership Rights Under Russian Law

Since United States law permits suit only by owners of "an exclusive right under a copyright," 17 U.S.C. § 501(b), we must first determine whether any of the plaintiffs own an exclusive right. That issue of ownership, as we have indicated, is to be determined by Russian law.

■ Determination of a foreign country's law is an issue of law. *See* Fed.R.Civ.P. 44.1; *Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir.1970). Even though the District Court heard live testimony from experts from both sides, that Court's opportunity to assess the witnesses' demeanor provides no basis for a reviewing court to defer to the trier's ruling on the content of foreign law. In cases of this sort, it is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they expressed. *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998) ("[A]ppellate courts, as well as trial courts, may find and apply foreign law.").

■ Under Article 14 of the Russian Copyright Law, Itar–Tass is the owner of the copyright interests in the articles written by its employees. However, Article 14(4) excludes newspapers from the Russian version of the work-for-hire doctrine. The newspaper plaintiffs, therefore, must locate their ownership rights, if any, in some other source of law. They rely on Article 11. The District Court upheld their position, apparently recognizing in the newspaper publishers "exclusive" rights *to the articles,* even though, by virtue of Article 11(2), the reporters also retained "exclusive" rights to these articles.

Having considered all of the views presented by the expert witnesses, we conclude that the defendants' experts are far more persuasive as to the meaning of Article 11. In the first place, once Article 14 of the Russian Copyright Law explicitly denies newspapers the benefit of a work-for-hire doctrine, which,

if available, would accord them rights to individual articles written by their employees, it is highly unlikely that Article 11 would confer on newspapers the very right that Article 14 has denied them. Moreover, Article 11 has an entirely reasonable scope if confined, as its caption suggests, to defining the "Copyright of Compilers of Collections and Other Works." That article accords compilers copyright "in the selection and arrangement of subject matter that he has made insofar as that selection or arrangement is the result of a creative effort of compilation." Russian Copyright Law, Art. 11(1). Article 11(2) accords a publisher of compilations the right to exploit such works, including the right to insist on having their names mentioned, while expressly reserving to "authors of the works included" in compilations the "exclusive rights to exploit their works independently of the publication of the whole work." *Id.* Art. 11(2). As the defendants' experts testified, Article 11 lets *authors* of newspaper articles sue for infringement of their rights in the text of their articles, and lets *newspaper publishers* sue for wholesale copying of all of the newspaper or for copying any portions of the newspaper that embody their selection, arrangement, and presentation of articles (including headlines)—copying that infringes their ownership interest in the compilation.

Newcity's contrary interpretation, according publishers (and reporters) exclusive rights to the text of articles, draws entirely unwarranted significance from the shift of the phrase "as a whole" from the first to the second paragraph of Article 11(2). One would not expect drafters of the revised Article 11(2) to accomplish a major broadening of the rights of newspaper publishers simply by shifting the placement of this phrase. Moreover, the drafter of the revision testified that the shift was a matter of grammar, and not of any substance. Furthermore, Newcity's interpretation rests on the untenable premise that both the publisher of a newspaper and the author of an article have exclusive rights to the same article. Under his interpretation, as he acknowledged, the publisher could grant a license to a third party to publish an article, the "exclusive" rights to which are held by the author. That unlikely result

cannot be accepted in the absence of clear statutory language authorizing it.[13]

The opinion of the Informational Disputes Chamber is not a sufficient basis for upholding the plaintiffs' interpretation. As the defendants' experts pointed out, the bylaws of that body confine its authority to matters affecting free press issues, and explicitly preclude it from adjudicating issues arising under copyright law. Moreover, the opinion that the Chamber rendered does not necessarily support the plaintiffs' position. In asserting that a newspaper may petition for redress "in defense of its rights," the Chamber might have meant only that a newspaper can protect its limited compilation rights in the selection and arrangement of articles even when only a small number of articles are copied. The opinion of the Chamber does not state that the newspaper has a protectable copyright interest in the text of each article.[14]

Nor can the District Court's conclusion be supported by its observation that extensive copying of newspapers will ensue unless newspapers are permitted to secure redress for the copying of individual articles. In the first place, copying of articles may always be prevented at the behest of the authors of the articles or their assignees. Second, the newspapers may well be entitled to prevent copying of the protectable elements of their compilations. Lastly, even if authors lack

sufficient economic incentive to bring individual suits, as the District Court apprehended, Russian copyright law authorizes the creation of organizations "for the collective administration of the economic rights of authors ... in cases where the individual exercise thereof is hampered by difficulties of a practical nature." Russian Copyright Law, Art. 44(1). Indeed, UJR, the reporters' organization, may well be able in this litigation to protect the rights of the reporters whose articles were copied by *Kurier.*

*Relief.* Our disagreement with the District Court's interpretation of Article 11 does not mean, however, that the defendants may continue copying with impunity. In the first place, Itar–Tass, as a press agency, is within the scope of Article 14, and, unlike the excluded newspapers, enjoys the benefit of the Russian version of the work-for-hire doctrine. Itar–Tass is therefore entitled to injunctive relief to prevent unauthorized copying of its articles and to damages for such copying, and the judgment is affirmed as to this plaintiff.

Furthermore, the newspaper plaintiffs, though not entitled to relief for the copying of the text of the articles they published, may well be entitled to injunctive relief and damages if they can show that *Kurier* infringed the publishers' ownership interests in the newspaper compilations.[15] Because the Dis-

---

13. Newcity sought to analogize the exclusive rights that he believed were held by both the newspaper and the author to the rights held jointly by co-authors. Russian copyright law, however, like similar provisions elsewhere, recognizes jointly held rights in "a work that is the product of the joint creative work of two or more persons." Russian Copyright Law, Art. 10(1). In the absence of either joint authorship or contractual arrangements, it would be most unusual to have exclusive rights held by anyone other than the author.

14. Also unpersuasive is the opinion of an arbitration court of the Altai Region of Russia, *Closed Stock Company Komsomolskaya Pravda v. Limited Liability Company RIA Nasha Pressa,* Case # 235/98–10 (City of Barnaul, Russian Federation, Feb. 25, 1998), which awarded damages to a newspaper for another publication's reprinting of two articles from the newspaper. The opinion of the arbitration court (furnished to us by the appellees) deems exclusive rights in the articles to be owned by the newspaper by virtue of Article 14(2) of the Russian Copyright Law, ignoring

the provision of Article 14(4), which renders Article 14(2) inapplicable to newspapers.

15. Though the complaint does not precisely plead infringement of compilation rights, it does allege that the newspapers have rights "in the newspapers," Complaint ¶ 22, and that the defendants have copied "numerous items of Plaintiffs' Subject Works," *id.* ¶ 28. Moreover, when, during the trial, counsel for the defendants objected to a question concerning the "appearance" of some copied text on the ground that "[t]here is no allegation[ ] in this case about the creative appearance being infringed," counsel for the plaintiffs replied, "That is, indeed, one of our central arguments."

Moreover, though the parties do not raise the issue, we may assume that the authors of the articles, by submitting them to their newspaper publishers, gave the publishers an implied license to use the articles in the newspaper compilations. That non-exclusive license, of course, does not entitle the publishers to sue in the

trict Court upheld the newspapers' right to relief for copying the text of the articles, it had no occasion to consider what relief the newspapers might be entitled to by reason of *Kurier*'s copying of the newspapers' creative efforts in the selection, arrangement, or display of the articles. Since *Kurier*'s photocopying reproduced not only the text of articles but also headlines and graphic materials as they originally appeared in the plaintiffs' publication, it is likely that on remand the newspaper plaintiffs will be able to obtain some form of injunctive relief and some damages. On these infringement issues, as we have indicated, United States law will apply.

Finally, there remains for consideration what relief, if any, might be awarded to UJR, acting on behalf of any of its members whose articles have been copied. In its opinion granting the newspapers a preliminary injunction, the District Court noted that the plaintiffs had not "established the union's organizational standing to sue to enforce the rights of its members," an issue the Court expected would be considered later in the lawsuit. *See Itar–Tass I*, 886 F.Supp. at 1122 n. 2. In its ruling on the merits, the District Court ruled that the UJR had standing to sue on behalf of its members. *See Itar–Tass II*, 1997 WL 109481, at *11. However, the Court noted that UJR sought only injunctive relief and then ruled that since UJR declined to furnish a list of its members, the Court was unable to frame an injunction that would be narrowly tailored and sufficient to give the defendants notice of its scope. *See id.*

In view of our conclusion that the newspaper plaintiffs may not secure relief for the copying of the text of any articles as such, it will now become appropriate for the District Court on remand to revisit the issue of whether relief might be fashioned in favor of UJR on behalf of the authors. Despite

UJR's unwillingness to disclose its entire membership list, it might be possible to frame some form of injunctive relief that affords protection for those author-members that UJR is willing to identify. And UJR should now be given an opportunity to amend its prayer for relief to state whatever claim it might have to collect damages for the benefit of its member-authors whose rights have been infringed. Finally, the District Court should consider the appropriateness and feasibility of giving some form of notice (perhaps at the defendants' expense) that is calculated to alert the authors of the infringed articles to their right to intervene in this lawsuit. Such notice might, for example, be addressed generally to the group of reporters currently employed at each of the plaintiff newspapers.

In view of the reckless conduct of the defendants in the flagrant copying that infringed the rights of Itar–Tass, the rights of the authors, and very likely some aspects of the limited protectable rights of the newspapers, we will leave the injunction in force until such time as the District Court has had an opportunity, on remand, to modify the injunction consistent with this opinion and with such further rulings as the District Court may make in light of this opinion.[16]

## Conclusion

Accordingly, we affirm the judgment to the extent that it granted relief to Itar–Tass, we reverse to the extent that the judgment granted relief to the other plaintiffs, and we remand for further proceedings.[17] No costs.

---

United States for infringement of the articles as such.

**16.** Upon remand, the District Court will also have to consider, if the claim is pursued, what relief might be accorded to plaintiff-appellee Heslin Trading Ltd., the publisher of *Balagan*, a Russian language comic magazine published monthly in Israel. What ownership interests Heslin might have, under Israeli law, that have

been infringed, under United States law, by *Kurier*'s copying was not explicitly considered by the District Court.

**17.** While this appeal was pending, we received a motion from Al J. Daniel, Jr., seeking to intervene in support of the judgment in order to protect the value of a charging lien he asserts as former counsel for the plaintiffs. *See Itar–Tass*

*Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442 (2d Cir.1998). We deny the motion to intervene, without prejudice to renewal in the District Court on remand.