[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 25, 2011
JOHN LEY
CLERK

_____

No. 10-10626

_____

D.C. Docket No. 1:08-cv-20373-PAS

SAREGAMA INDIA LTD.,

Plaintiff - Appellant,

versus

TIMOTHY MOSLEY,
a.k.a. Timbaland,
AFTERMATH ENTERTAINMENT,
G UNIT RECORDS, INC.,
name amended per DE #66
Amended Complaint,
INTERSCOPE RECORDS,
UNIVERSAL MUSIC GROUP, et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 25, 2011)

Before BARKETT and MARCUS, Circuit Judges, and RESTANI,[*] Judge.

MARCUS, Circuit Judge:

This case concerns a copyright infringement action brought by Saregama India Ltd. ("Saregama") against the Defendants for copying, or digitally sampling, a portion of the Indian song, "Baghor Mein Bahar Hai" ("BMBH"), in the hip-hop song, "Put You on the Game" ("PYOG"). Saregama, an Indian music production and distribution company, claims that it owns a copyright in the sound recording of BMBH pursuant to a 1967 agreement (the "Agreement") between the Indian film producer, Shakti Films ("Shakti"), and Saregama's predecessor in interest, Gramophone Company of India, Ltd. ("Gramophone"). At the core of its claim, Saregama says that the Defendants' digital sampling of BMBH infringed on its alleged sound recording copyright. Saregama appeals the district court's grant of final summary judgment in the Defendants' favor.

The single question before us is whether the Agreement conferred on Saregama a copyright in the sound recording of BMBH that Saregama continues to own today. After closely examining the Agreement, we hold that the Agreement unambiguously conferred on Saregama only a two-year exclusive right, or copyright, to re-record any

[*] Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

pre-recorded song covered by the Agreement -- a right that became non-exclusive, and thus ceased being a copyright, at the conclusion of the Agreement's two-year term. Thus, even if BMBH were covered by the Agreement (a question we need not decide), Saregama would not <u>currently</u> own a copyright in the BMBH sound recording and thus lacks statutory standing to bring this copyright infringement action. We, therefore, affirm the district court's order granting summary judgment for the Defendants.

## I.

The essential facts surrounding this copyright dispute are these. Since the resolution of this lawsuit turns on the interpretation of the Agreement, we detail its provisions at some length.

On April 24, 1967, Shakti and Gramophone, Saregama's predecessor in interest, entered into an agreement regarding the production and distribution of the musical soundtracks accompanying Shakti's films.[1] By its terms, the Agreement took effect on January 15, 1967 and was to last for two years, until January 15, 1969. (DE

---

[1] Both Shakti and Saregama are companies located and incorporated in India. As Saregama explains it, in March 1995, Gramophone transferred all of its copyrights to Gramco Music Publishing Private Ltd. ("Gramco"), and, after Gramco merged into Gramophone in June 2000, all of Gramco's assets, including any copyrights, were transferred to Gramophone. Appellant Br. at 4. In March 2000, Gramophone changed its name to "Saregama India Ltd." <u>Id.</u> Saregama is, therefore, the successor in interest to both Gramco and Gramophone. <u>Id.</u> Thus, in describing the Agreement, this opinion refers to "Gramophone" and "Saregama" interchangeably, given that any rights the Agreement conferred on Gramophone currently belong to Saregama.

3

187-2 ¶ 2.) Before the Agreement's termination and upon written notice, however, Gramophone could extend the term of the Agreement for an additional year, until January 15, 1970.[2] (Id. ¶ 12.) The Agreement also provides that its terms are governed by Indian law.[3] (Id. ¶ 15.)

According to the Agreement, there are two means by which Shakti would supply music to Gramophone. Under the first, Shakti would supply Gramophone with artists and musicians who would render new performances of the musical works from Shakti's films for the purpose of creating new sound recordings.[4] The Agreement provides that Gramophone retained creative control over these new recordings.[5]

---

[2] There is no evidence of such written notice, and thus no indication that Saregama extended the term of the Agreement for another year.

[3] The governing law is Indian copyright law as laid out in the Indian Copyright Act of 1957 ("ICA"), which was amended in 1999. This opinion cites to and quotes from the amended version of the ICA.

[4] Clause 2 of the Agreement, which describes the first method, reads this way:

> [Shakti] shall . . . supply [Gramophone] at [its] own expense with artistes and musicians etc., to perform musical and/or other works from [its] films for the purpose of making gramophone records, and the artistes and musicians etc., shall attend at [Gramophone's] studio or such other place as may be appointed by [Gramophone] and shall at such place and time record such works as [Gramophone] shall select . . . .

(DE 187-2 ¶ 2.)

[5] Clause 3 says that "[Shakti] shall at the request of [Gramophone] supply the artistes and musicians etc., to repeat any work until a perfect master matrix thereof shall, in the opinion of

4

Under the second means, Shakti would provide Gramophone with pre-recorded songs, or sound recordings, which Gramophone could then re-record to manufacture records.[6] Unlike with the new recordings, Gramophone was not given creative control over the pre-recorded songs. Shakti, therefore, agreed to indemnify Gramophone against any subsequent actions by third parties claiming rights in the pre-recorded songs.[7]

Pursuant to Clause 7, Shakti assigned to Gramophone its recording rights in both the new recordings and pre-recorded songs.[8] As Clause 5 describes, these

---

[Gramophone], have been obtained." (DE 187-2 ¶ 3.)

[6] Clause 4, which describes this second means, provides:

Notwithstanding the provisions in Clauses 2 and 3 hereof [Shakti] shall at [its] own expense alternatively and subject to the consent of [Gramophone] supply [Gramophone] with sound tracks or recorded tapes of [its] musical and/or other works and [Gramophone] shall utilise such sound tracks or recorded tapes for the purpose of re-recording therefrom and the subsequent manufacture of gramophone records as referred to in the above-mentioned clauses provided they are in the opinion of [Gramophone] suitable for such purpose.

(DE 187-2 ¶ 4.)

[7] Specifically, "[Shakti] agree[d] to indemnify [Gramophone] and keep [Gramophone] indemnified from and against all actions, claims and damages in which [Gramophone] may be incurred by reason of such re-recording and subsequent manufacture, issue and sale of gramophone records derived from sound tracks or recorded tapes supplied by [Shakti] as aforesaid." (DE 187-2 ¶ 4.)

[8] Clause 7, which describes this assignment, explains the terms this way:

[Shakti] hereby agree[s] that [it] assign[s] [its] gramophone recording rights in all works to be recorded or re-recorded under the provisions of this Agreement to [Gramophone], and hereby agree[s] further to indemnify and keep

5

recordings rights were to be exclusive from January 15, 1967 to January 15, 1969.

Specifically, Clause 5 provides that, during the Agreement's two-year term, Shakti was prohibited from allowing any third party to record the new recordings or to re-record the pre-recorded songs -- that is, Shakti was barred from granting recording rights to any third party.[9]

---

> indemnified [Gramophone] in the case of such works as aforesaid from and against all actions, claims and damages which [Gramophone] may incur by reason of the recording, issue and sale of such works.

(DE 187-2 ¶ 7.)

In conjunction with this assignment of recording rights, the Agreement provides that "[Gramophone] shall be the owner of the original plate within the meaning of The [Indian] Copyright Act of 1957, and any extensions or modifications thereof of each title recorded or re-recorded under the provisions of this Agreement at the time when such plate shall be made." (DE 187-2 ¶ 10.) Under the ICA, a "plate" includes:

> any stereotype or other plate, stone, block, mould, matrix, transfer, negative, duplicating equipment or other device used or intended to be used for printing or reproducing copies of any work, and any matrix or other appliance by which sound recording for the acoustic presentation of the work are or are intended to be made.

ICA, ch. 1, § 2(t).

[9] Clause 5 delineates the recording rights' exclusivity like so:

> [Shakti] shall not during the said period of two year(s) allow any of [its] musical and/or other works to be recorded or re-recorded by any of [its] artistes and musicians etc., or from any film sound tracks or recorded tapes or other means for any other person, firm or corporation whatsoever carrying on a business similar to or in competition with that of [Gramophone] in all or any of its branches.

(Id. ¶ 5.)

6

The Agreement also provides Gramophone with a broad set of rights but only with respect to new recordings. Specifically, Clause 10 confers on Gramophone the sole right to produce, reproduce, sell, use, and perform the new recordings.[10] Notably, Shakti did not confer on Gramophone these expansive rights with respect to pre-recorded songs.

In addition to delineating the rights conferred, the Agreement also describes the royalty payments Gramophone was to make to Shakti from the sales of the records Gramophone manufactured. The royalty payments for new recordings and those for pre-recorded songs are laid out in separate provisions -- Clause 6 describing the royalty payments for new recordings,[11] and Clause 8 describing those for pre-recorded songs.[12] Clause 6 further provides that, if after the Agreement's two-year term, Shakti

---

[10] Clause 10 says that "[Gramophone] shall also be entitled to the sole right of production, reproduction, sale, use and performance (including broadcasting) throughout the world by any and every means whatsoever of the records of the works performed by the artistes and musicians etc. under this Agreement." (DE 187-2 ¶ 10.)

[11] As Clause 6 explains:

> "[Gramophone] during the said period of two year(s) and thereafter while the records recorded or re-recorded under the provisions of this Agreement remain on sale by [Gramophone] shall pay to [Shakti] a royalty on nett [sic] sales made in any part of the world of all records of the performance of the artistes and musicians etc. as aforesaid . . . ."

(DE 187-2 ¶ 6.)

[12] As Clause 8 explains: "In consideration of the assignment set out in Clause 7 hereof [Gramophone] shall pay to [Shakti] a Copyright royalty on nett [sic] sales made in any part of the world of the works recorded or re-recorded under the provisions of this Agreement . . . ." (DE

7

were to grant recording rights to any third party, Gramophone would no longer be bound to pay royalties on the new recordings.[13] In addition, Clause 10 says that, when these royalty payments on both new recordings and pre-recorded songs were to become due, Gramophone was entitled to confer on third parties the ability to manufacture and sell the records Gramophone recorded or re-recorded under the Agreement.[14]

After the parties entered into the Agreement, in either 1969 or 1970, Shakti

---

187-2 ¶ 8.)

[13] Specifically, Clause 6 says:

> [I]f [Shakti] shall at any time after the conclusion of the said period of two year(s) allow [its] artistes or musicians etc. or any of them to record any works recorded or re-recorded under the provisions of this Agreement or permit the recording of such works from any film sound track or recorded tape or other means, for any other person, firm or corporation whatsoever, [Gramophone] shall be no longer bound by this section and shall not have to pay any royalty whatsoever to [Shakti] under this section . . . .

(DE 187-2 ¶ 6.)

[14] Clause 10 details that:

> "[Gramophone] shall in its absolute discretion be entitled to authorise any other persons, firms or corporations in any part of the world to manufacture, sell and/or catalogue records of all or any of the titles recorded or re-recorded under the provisions of this Agreement when royalties shall become payable to [Shakti] as mentioned in Clauses 6 and 8 hereof."

(DE 187-2 ¶ 10.)

8

released the Indian film, "Aradhana," which featured the romantic duet, BMBH.[15]  In 2005, Jayceon Taylor (a.k.a. "The Game") released an album entitled "The Documentary," which featured the song, PYOG.  As the producer of PYOG, Defendant Timothy Mosley (a.k.a. "Timbaland") included in this song an approximately one-second looped snippet[16] from the sound recording of BMBH.

The sampled portion of BMBH is performed by a female vocalist (DE 182-2 at 2) and consists of three notes -- D, B flat, and G -- which form a descending chord known as a G minor arpeggio (DE 178-4 ¶ 11).  In BMBH, this snippet is looped four times in four separate sections of the song -- at 0:21, 0:38, 1:49, and 2:52.  (DE 178-4 ¶ 12-13; DE 182-2 at 2.)  In PYOG, this snippet is looped three times and, after an intervening D note, is looped twice again, and this loop appears in four separate sections of the song -- at 1:08, 2:03, 3:08, and 3:47.  (DE 178-4 ¶ 14-15.)

On August 27, 2007, Saregama commenced this lawsuit against the Defendants[17] in the United States District Court for the Southern District of New

---

[15] Saregama alleges that the film was released in 1969, whereas the Defendants allege that it was released in 1970.

[16] According to Saregama's expert, the snippet's precise duration is 1.131 seconds.  (DE 182-2 at 3.)

[17] The Defendants are Timothy Mosley (a.k.a. "Timbaland"), G-Unit Records, Inc., Desperado Entertainment Inc., WB Music Corp., Universal Music & Video Distribution Inc., Universal Music Group, Interscope Records, and Aftermath Entertainment.

York, alleging copyright infringement in violation of state and federal law and seeking damages and injunctive relief. Soon thereafter, on the Defendants' motion, the case was transferred to the United States District Court for the Southern District of Florida, where the district court granted the Defendants' motion to dismiss with leave for Saregama to re-plead.

On November 4, 2008, Saregama filed an amended complaint, alleging this time that it owned the copyright in the musical composition and sound recording of BMBH and that the Defendants had infringed on both copyrights by digitally sampling a portion of BMBH in PYOG.[18] Saregama also sued for common law copyright infringement, unfair competition, and a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, et seq. The Defendants again moved to dismiss, which the district court granted in part, disposing

---

[18] The difference between a copyright in a musical composition and a copyright in a sound recording has been aptly explained this way:

> A sound recording as copyrightable subject matter must be distinguished from the copyrighted literary, musical or dramatic work embodied in the sound recording and fixed on a phonorecord. When a copyrighted song is recorded on a phonorecord, there are two separate copyrights: one on [sic] the musical composition and the other in the sound recording. The sound recording is the aggregation of sounds captured in the recording while the song or tangible medium of expression embodied in the recording is the musical composition. Thus, the rights of an owner of a copyright in a sound recording do not extend to the song itself. A copyright in the recording and in the song are separate and distinct and by statute are treated differently.

T.B. Harms Co. v. Jem Records, Inc., 655 F. Supp. 1575, 1576 n.1 (D.N.J. 1987) (citation omitted).

10

of Saregama's common law copyright infringement and unfair competition claims on preemption grounds. Saregama then voluntarily dismissed its FDUTPA claim and its musical composition copyright infringement claim, leaving the sound recording copyright infringement claim as Saregama's only cause of action.

Saregama and the Defendants then filed cross-motions for summary judgment, and on December 23, 2009, the district court denied Saregama's motion and granted the Defendants' on two independent grounds. First, the court found that the Agreement conferred, at most, a two-year exclusive license, which became non-exclusive thereafter, to exploit Shakti's pre-recorded songs, and that Saregama had not offered any proof either that the BMBH sound recording had been created during the Agreement's two-year term or that Saregama had obtained the sound recording copyright through other means. Saregama India Ltd. v. Mosley, 687 F. Supp. 2d 1325, 1326-27 (S.D. Fla. 2009). The district court also found that BMBH and PYOG were not substantially similar and that the Defendants' digital sampling of BMBH in PYOG was not, therefore, legally actionable. Id. at 1327.

Since we affirm the district court's summary judgment order because the Agreement did not confer on Saregama a sound recording copyright that Saregama continues to own today, we have no occasion to address the issue of substantial similarity. In other words, because we hold that Saregama does not own a copyright

11

in the first instance, we need not face the question of whether this copyright has been infringed.

**II.**

We review the district court's order granting summary judgment de novo. Acevedo v. First Union Nat'l Bank, 476 F.3d 861, 865 (11th Cir. 2007). "In conducting our review, we apply the same legal standards as the district court. . . . [and thus] review the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor." Id. Summary judgment is only proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1232 (11th Cir. 2010) (internal quotation marks omitted).

When the only question a court must decide is a question of law, summary judgment may be granted. See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1120 (11th Cir. 2005) ("A summary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law."). The interpretation of a contract, or agreement, presents a question of law, see Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc., 222 F.3d 895, 900 (11th Cir.

2000), as does the determination of whether a contract is ambiguous, see Orkin

Exterminating Co. v. FTC, 849 F.2d 1354, 1360 (11th Cir. 1988). And when a

contract is unambiguous, the parol evidence rule bars our consideration of extrinsic

evidence. Id. at 1362.

"To make out a prima facie case of copyright infringement, a plaintiff must

show that (1) it owns a valid copyright in the [work] and (2) defendants copied

protected elements from the [work]." Peter Letterese & Assocs., Inc. v. World Inst.

of Scientology Enters., Int'l, 533 F.3d 1287, 1300 (11th Cir. 2008). Saregama thus

bears the burden of proving that it owns the BMBH sound recording copyright.

Because we conclude that Saregama does not currently own a valid copyright in the

BMBH sound recording, we have no occasion to decide whether the Defendants

copied protected elements from BMBH. Therefore, we only address the copyright

ownership issue.

"Initial ownership of a copyrighted work is determined by the laws in the

work's country of origin." Lahiri v. Universal Music & Video Distrib., Inc., 513 F.

Supp. 2d 1172, 1176 n.4 (C.D. Cal. 2007); accord Itar-Tass Russian News Agency

v. Russian Kurier, Inc., 153 F.3d 82, 90 (2d Cir. 1998). As the parties all agree,

inasmuch as BMBH was created in India, our interpretation of the Agreement and

ultimate determination of whether Saregama owns a copyright in the BMBH sound

13

recording is governed by Indian copyright law, as laid out in the Indian Copyright Act of 1957 ("ICA"). We add that, although the ICA governs the issue of copyright ownership, Saregama still must meet the statutory standing requirement contained in the Copyright Act of 1976, 17 U.S.C. § 501(b), which provides that only the legal or beneficial owner of an "exclusive right" has standing to bring a copyright infringement action in a United States court. See 17 U.S.C. § 501(b); Itar-Tass, 153 F.3d at 91.

To begin with, under the ICA, the initial owner of the copyright in a work is the "author" of that work. ICA, ch. 4, § 17. When the work is a sound recording,[19] the ICA provides that the "producer" of the sound recording is that recording's "author." Id. ch. 1, § 2(d)(v). The producer of a sound recording is, therefore, the initial owner of the copyright in that sound recording. However, absent an agreement to the contrary, the producer of a film is considered the initial copyright owner of the music from that film. Lahiri, 513 F. Supp. 2d at 1176 (interpreting the Supreme Court of India's decision in Indian Performing Rights Society Ltd. v. East Indian Motion Picture Ass'n & Others, A.I.R. 1977 S.C. 1443).[20] Thus, a film's producer

_____

[19] The ICA defines a "sound recording" as "a recording of sounds from which such sounds may be produced regardless of the medium on which such recording is made or the method by which the sounds are produced." ICA, ch. 1, § 2(xx).

[20] The Supreme Court of India held: "[U]nless there is a contract to the contrary, a composer who composes a lyric or music for the first time for valuable consideration for a

14

generally owns the copyright in the sound recordings taken from that film.

Section 14 of the ICA describes what it means, under Indian law, to own a copyright in a sound recording this way:

> For the purposes of this Act, "copyright" means the <u>exclusive right</u> subject to the provisions of this Act, to do or authorise the doing of <u>any</u> of the following acts in respect of a work or any substantial part thereof, namely:-
>
> . . . .
>
> (e) in the case of sound recording, -
>
> (i) to make any other sound recording embodying it;
>
> (ii) to sell or give on hire, or offer for sale or hire, any copy of the sound recording regardless of whether such copy has been sold or given on hire on earlier occasions;
>
> (iii) to communicate the sound recording to the public.

ICA, ch. 3, § 14 (emphasis added). As the ICA makes clear, to own a copyright in a sound recording is to have the <u>exclusive</u> right to perform one, two, or all three of the acts listed in section 14(e). In other words, theoretically there could be three separate

cinematograph film does not acquire any copyright either in respect of [the] film or its <u>sound track</u> . . . and that under proviso (b) to Section 17 of the Act, the owner of the film, at whose instance the composition is made, becomes the <u>first owner of the copyright in the composition</u>." <u>Lahiri</u>, 513 F. Supp. 2d at 1176 (internal quotation marks omitted) (alterations and emphasis in original). Section 17(b) of the ICA provides that, "subject to the provisions of clause <u>(a)</u>, in the case of . . . a cinematograph film made, for valuable consideration at the instance of any person, such person shall, in the absence of any agreement to the contrary, be the first owner of the copyright therein." ICA, ch. 4, § 17(b).

15

owners of a sound recording copyright: (i) one owner who has the exclusive right "to make any other sound recording embodying [the original sound recording]"; (ii) a second owner who has the exclusive right "to sell or give on hire, or offer for sale or hire, any copy of the sound recording"; and (iii) a third owner who has the exclusive right "to communicate the sound recording to the public." To possess any of these exclusive rights is thus to be a copyright owner in the subject sound recording. Cf. Davis v. Blige, 505 F.3d 90, 98 (2d Cir. 2007) (describing copyright ownership as a "bundle of discrete rights").

Although Indian law undoubtedly governs the determination of initial copyright ownership, there is no guiding case law regarding which country's law governs the issue of copyright transfer. See Itar-Tass, 153 F.3d at 91 n.11 ("In deciding that the law of the country of origin determines the ownership of copyright, we consider only initial ownership, and have no occasion to consider choice of law issues concerning assignment of rights."); Films by Jove, Inc. v. Berov, 154 F. Supp. 2d 432, 477 n.42 (E.D.N.Y. 2001) (noting that the Second Circuit in Itar-Tass did not reach the transfer choice-of-law issue). We assume without deciding that Indian law governs the assignment issue, since Indian copyright law of assignment is strikingly

16

similar to U.S. copyright law.[21] We would reach the same result under either Indian

or American law.

Under the ICA, the assignment of copyright ownership is described in these

terms:

> The owner of the copyright in an existing work or the prospective owner of the copyright in a future work may assign to any person the copyright either wholly or partially and either generally or subject to limitations and either for the whole term of the copyright or any part thereof:

> Provided that in the case of the assignment of copyright in any future work, the assignment shall take effect only when the work comes into existence.

ICA, ch. 4, § 18(1).[22]   The ICA makes clear that, when some but not all of the

---

[21] We also refrain from deciding this transfer choice-of-law question because the parties have neither fully briefed nor contested this issue.  See Clark v. Crosby, 335 F.3d 1303, 1313 n.10 (11th Cir. 2003) (declining to address an issue in part because the parties had not briefed the issue in detail).  Saregama assumes that Indian copyright law governs, without explicitly stating that American copyright law does not.  The Defendants, on the other hand, argue in terms of both Indian and American law, without asserting which country's law governs.  See Appellee Br. at 25 ("Under both Indian and U.S. law, a transfer of copyright interest must be made expressly and in writing.").

[22] The U.S. Copyright Act similarly defines a "transfer of copyright ownership" as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license."  17 U.S.C. § 101; see also 2 William F. Patry, Patry on Copyright § 5:101, at 5-190 (2010) ("A copyright owner may transfer copyright ownership by assignment or exclusive license, the two being synonymous.").  17 U.S.C. § 201(d) further provides:

> (1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.

exclusive rights that comprise a copyright are assigned, both the assignor and the assignee are copyright owners with respect to the exclusive rights that they hold. Specifically, section 18 of the ICA provides:

> Where the assignee of a copyright becomes entitled to any right comprised in the copyright, the assignee as respects the rights so assigned, and the assignor as respects the rights not assigned, shall be treated for the purposes of this Act as the owner of copyright and the provisions of this Act shall have effect accordingly.

Id. § 18(2).

Thus, if the initial owner of a sound recording copyright were to assign only the first of the three exclusive rights that comprise this copyright -- namely, the exclusive right "to make any other sound recording embodying [the original sound recording]" -- the assignee would be a sound recording copyright owner with respect to this first exclusive right, while the assignor would remain a copyright owner with respect to the remaining two exclusive rights -- namely, the exclusive right "to sell

---

(2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

17 U.S.C. § 201(d). Therefore, under both Indian and American copyright law, to own any exclusive right comprised in a copyright is to be a copyright owner, and there can be multiple copyright owners in a single work. Moreover, under both countries' laws, a copyright owner can assign one, several, or all of its exclusive rights, and this assignment can be subject to temporal or geographic limitations.

or given on hire, or offer for sale or hire, any copy of the sound recording" and the exclusive right "to communicate the sound recording to the public."  In this light, pursuant to 17 U.S.C. § 501(b), both the assignor and the assignee would have statutory standing to bring a copyright infringement claim because both would be "legal or beneficial owner[s] of an exclusive right under a copyright."  17 U.S.C. § 501(b).  It follows, however, that each could only bring a copyright infringement claim based upon the infringement of the exclusive right(s) each holds.

The ICA further lays out what is required for a copyright assignment to be valid this way:

> (1) No assignment of the copyright in any work shall be valid unless it is in writing signed by the assignor or by his duly authorised agent.
>
> (2) The assignment of copyright in any work shall identify such work, and shall specify the rights assigned and the duration and territorial extent of such assignment.
>
> (3) The assignment of copyright in any work shall also specify the amount of royalty payable, if any, to the author or his legal heirs during the currency of the assignment and the assignment shall be subject to revision, extension or termination on terms mutually agreed upon by the parties.

Id. ch. 4, § 19.[23]  In this light, regardless of which exclusive right, or rights, a

---

[23] The U.S. Copyright Act similarly provides that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an assignment of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."  17 U.S.C. § 204(a).

copyright owner transfers, such assignment must be documented in a signed writing that clearly delineates the right being transferred and any limitations the copyright owner seeks to impose.

## III.

Applying these principles of Indian copyright law to the facts of this case, we begin by observing that, as the producer of the film, "Aradhana," Shakti is the initial owner of the copyright in the BMBH sound recording. Saregama, however, bases its copyright ownership claim on the Agreement.[24] Therefore, the resolution of the case turns on whether, through the Agreement, Shakti assigned to Saregama <u>any</u> of the three exclusive rights comprised in a sound recording copyright and, if so, whether Saregama continues to hold this exclusive right today.

Saregama claims that, through the Agreement, Shakti transferred to Saregama a copyright in any sound recording created during the Agreement's two-year term -- whether these sound recordings were new recordings, as described in Clause 2, or pre-recorded songs, as described in Clause 4. The Defendants, on the other hand, say that, although the Agreement conferred on Saregama expansive rights with respect

---

[24] Saregama alternatively claims to be the initial owner of the copyright in the BMBH sound recording because "the 1967 Agreement could reasonably be interpreted to indicate that [Saregama], as the 'author' and creator of the subject sound recording, was the owner by virtue of being the 'producer' of the work." Appellant Br. at 14. Not only is this argument without merit, but Saregama also raises it for the first time on appeal. We, therefore, decline to consider it. <u>See</u> <u>Harrison v. Benchmark Elecs. Huntsville, Inc.</u>, 593 F.3d 1206, 1214 n.8 (11th Cir. 2010).

20

to new recordings, as for pre-recorded songs, the Agreement only conferred a defined and limited right to manufacture and sell records -- that is, the right to exploit the pre-recorded songs. The Defendants further argue that, whatever rights the Agreement conferred on Saregama, they were only exclusive for the Agreement's two-year term, and that there is no evidence BMBH is even covered by the Agreement.

After carefully examining the language of the Agreement, we conclude that, through the Agreement, Shakti assigned to Saregama the first of the exclusive rights that comprise a sound recording copyright -- the exclusive right "to make any other sound recording embodying [the original sound recording]." However, this right became non-exclusive at the end of the Agreement's two-year term, on January 15, 1969. Today, therefore, Saregama does not continue to hold this exclusive right, and thus does not continue to own a sound recording copyright.

Again, the Agreement contemplates two different kinds of sound recordings: (1) new recordings and (2) pre-recorded songs. Thus, as a threshold matter, if the BMBH sound recording were covered by the Agreement, it would constitute a pre-recorded song. It would not constitute a new recording, since there is no evidence that BMBH was created by Saregama using Shakti's artists and musicians, as Clause 2 requires. In this light, only the provisions in the Agreement conferring and limiting rights in pre-recorded songs -- Clauses 10, 7, 5, and 6 -- are relevant to our analysis.

21

In interpreting the Agreement, we first look to those provisions that purport to confer rights on Saregama. Clause 10 provides that, with respect to both new recordings and pre-recorded songs, Gramophone is entitled to authorize third parties "to manufacture, sell, and/or catalogue" any records recorded or re-recorded under the Agreement, but only when royalties become payable. (DE 187-2 ¶ 10.) If exclusive, this provision could arguably correspond with the second exclusive right that comprises a sound recording copyright -- namely, the exclusive right "to sell or give on hire, or offer for sale or hire, any copy of the sound recording." ICA, ch. 3, § 14(e)(ii). However, not only does Clause 10 make no reference to any "right" -- speaking only in terms of acts Saregama can authorize others to perform -- but more importantly, there is also nothing in the Agreement indicating that this right, if it can even be called that, is exclusive.[25] Clause 10, therefore, does not confer a sound recording copyright on Saregama.

Clause 7, however, is the most critical right-conferring provision found in the entire Agreement, and the one on which Saregama primarily bases its copyright ownership claim. Through this clause, Shakti assigned to Saregama its "gramophone

___

[25] Although Clause 10 also confers a broad, and arguably exclusive, set of rights on Saregama -- "the sole right of production, reproduction, sale, use and performance (including broadcasting)" -- the Agreement explicitly provides that these rights only apply to new recordings. (DE 187-2 ¶ 10.) Because BMBH would constitute a pre-recorded song, these expansive rights are inapposite to Saregama's claim of ownership of the BMBH sound recording copyright.

22

recording rights in all works to be recorded or re-recorded under the provisions of this Agreement." (DE 187-2 ¶ 7.) If exclusive, this assignment of the right to re-record pre-recorded songs corresponds with the first exclusive right that comprises a sound recording copyright -- the exclusive right "to make any other sound recording embodying [the original sound recording]." ICA, ch. 3, § 14(e)(i).

Indeed, Clause 5 says that this re-recording right is in fact exclusive, providing that Shakti cannot allow the pre-recorded songs covered by the Agreement to be re-recorded by any third party. Therefore, by conferring on Saregama the exclusive right to re-record pre-recorded songs, Clauses 7 and 5 together conferred on Saregama a copyright in the sound recording of any pre-recorded song covered by the Agreement.[26]

Critically, however, Clause 5 imposes a temporal limitation on this exclusive right, or copyright. Specifically, Clause 5 limits the right's exclusivity to the two-year duration of the Agreement, providing that, "during the said period of two year(s)," Shakti cannot allow third parties to re-record any pre-recorded songs

[26] The royalty payments Saregama was to make to Shakti, under Clause 8 of the Agreement, are consistent with this copyright assignment. See ICA, ch. 4, § 19(3) ("The assignment of copyright in any work shall also specify the amount of royalty payable, if any, to the author or his legal heirs during the currency of the assignment . . . ."). However, the reference in Clause 8 to "[a] work or works owned by [Shakti]" make it clear that, by conferring only one of the three exclusive rights that comprise a sound recording copyright, Shakti retained copyright ownership interests in the pre-recorded songs. (See DE 187-2 ¶ 8.)

23

covered by the Agreement. (DE 187-2 ¶ 5.) Thus, it is only during the two-year term of the Agreement that Shakti is barred from conferring recording rights on third parties.

As Clause 6 makes clear, after the two-year term's expiration, Shakti is free to confer these recording rights on parties other than Saregama -- an arrangement that is entirely inconsistent with Saregama's continued ownership of a copyright, or exclusive right. Thus, Clause 6 specifically provides that, if after the Agreement's two-year term, Shakti were to allow a third party to re-record a pre-recorded song covered by the Agreement, the only penalty would be that Saregama could cease paying Shakti royalties on new recordings.[27] (Id. ¶ 6.)

If, as Saregama contends, Saregama continued to own a copyright in the sound recording of pre-recorded songs after the Agreement's two-year term, the consequence of Shakti granting third parties recording rights would not be the mere cessation of royalty payments. Rather, as the district court observed, "the appropriate action against Shakti's wrongful transfer of rights would [be] . . . an action for copyright infringement." Saregama, 687 F. Supp. 2d at 1333; cf. Davis, 505 F.3d at 101 ("[A]n exclusive licensee may sue others for infringement, including the licensor

---

[27] Saregama would, however, be required to continue paying Shakti royalties on pre-recorded songs, as dictated by Clause 8.

if the licensor infringes on the exclusive right he granted the licensee."). When read together, Clauses 5, 6, and 7 clearly provide that Shakti conferred on Saregama a two-year exclusive right, or copyright, to re-record the pre-recorded songs covered by the Agreement -- a right that unambiguously became non-exclusive upon the Agreement's termination on January 15, 1969.

As we see it, Saregama has erroneously interpreted the temporal limitation in Clause 5 as applying only to Saregama's "rights to act as the exclusive production company authorized to record Shakti's preexisting musical compositions with Shakti's contract musicians." Appellant Br. at 18. Saregama claims that the two-year limitation only applies to Saregama's right to record new recordings. However, Clause 5 provides that "[Shakti] shall not during the said period of two year(s) allow any of their musical and/or other works to be recorded or re-recorded by any of their artistes and musicians etc., or from any film sound tracks or recorded tapes or other means" by a third party. (DE 187-2 ¶ 5) (emphasis added). Clause 5 makes clear that the temporal limitation also applies to Saregama's right to re-record pre-recorded songs and thus applies to the entirety of the recording rights conferred by Clause 7. Indeed, the interpretation Saregama has advanced would require us to entirely read out of the Agreement the portion of Clause 5 we have underscored above.

Saregama also mistakenly says that "Clause 5 does not put a temporal

25

limitation on the assignment of works 'to be recorded or re-recorded under the provisions of this Agreement' set forth in Clause 7, or the rights to copy or distribute such works." Appellant Br. at 18. This argument fails for two reasons. First, Clause 7 does not assign works; rather, it assigns recording rights in such works. And second, whether or not the Agreement confers on Saregama the rights to copy or distribute, the Agreement does not provide that such rights are exclusive, making them irrelevant to the issue of copyright ownership.

In addition, Saregama misinterprets Clause 6 by reading essential language out of this provision, too. Specifically, Saregama contends that Clause 6 provides that royalty payments from Gramophone to Shakti can cease only if Shakti "allows its musicians 'to record any works recorded or re-recorded under . . . this Agreement.'" Id. at 20 (citing DE 187-2 ¶ 6) (alterations in original). However, the remainder of Clause 6 provides that royalty payments can also cease if Shaki "permit[s] the recording of such works from any film sound track or recorded tape or other means." (DE 187-2 ¶ 6.) In other words, Saregama selectively reads Clause 6, focusing only on the portion that highlights the limited nature of Saregama's right to record new recordings, while ignoring the portion concerning the limited nature of Saregama's right to re-record pre-recorded songs. It is only by ignoring the plain language of this provision that Saregama is able to argue that the two-year limitation applies only to

Saregama's right to record new recordings, and not to Saregama's right to re-record pre-recorded songs. We remain unpersuaded.

In short, by assigning to Saregama the exclusive right to re-record pre-recorded songs, Shakti assigned to Saregama a copyright in the sound recording of all pre-recorded songs covered by the Agreement. However, this exclusive right, or copyright, by its express terms, had a limited two-year duration. After the Agreement's two-year term expired, the right became non-exclusive and thus ceased being a copyright.[28] Saregama does not, therefore, presently own a copyright in the sound recording of any pre-recorded song covered by the Agreement.

Because we conclude that, through the Agreement, Shakti assigned to Saregama a two-year exclusive right to re-record the pre-recorded songs covered by the Agreement -- a right that became non-exclusive on January 15, 1969 -- we need not address whether the BMBH sound recording was in fact covered by the

---

[28] The district court held that the Agreement conferred on Saregama a two-year exclusive license that became non-exclusive thereafter. Saregama, 687 F. Supp. 2d at 1326. However, because Clause 7 uses the word "rights," while the word "license" appears nowhere in the Agreement, we find it more accurate to say that the Agreement conferred a two-year exclusive right. Cf. ICA, ch. 1, § 2(j) (defining an "exclusive licence" as "a licence which confers on the licensee or on the licensee and persons authorised by him, to the exclusion of all other persons (including the owner of the copyright), any right comprised in the copyright in a work, and 'exclusive licensee' shall be construed accordingly"). Nevertheless, under the ICA, an exclusive licensee is treated like a copyright owner. See ICA, ch. 12, § 54 (stating that an "owner of copyright" includes "an exclusive licensee" for purposes of the civil remedies chapter of the ICA); accord Patry, supra, § 5:101, at 5-190.1 - 5-191 ("[A]n exclusive licensee is a copyright owner and a copyright owner is nothing more than an owner of an exclusive right.").

27

Agreement.[29] This is so because, even if BMBH were covered, Saregama would not presently hold an exclusive right to re-record the BMBH sound recording, and thus would not presently own a copyright in this sound recording. Rather, Saregama would, at most, hold a non-exclusive right to re-record the BMBH sound recording, which does not constitute copyright ownership.

Thus, not only is Saregama unable to prove the first element of a prima facie case of copyright infringement -- that is, that it owns a valid copyright in the BMBH sound recording -- but it also lacks statutory standing to bring this claim. See Davis, 505 F.3d at 101 ("[T]he holder of a nonexclusive license may not sue others for infringement."); I.A.E., Inc. v. Shaver, 74 F.3d 768, 775 (7th Cir. 1996) ("[A] person holding a nonexclusive license has no standing to sue for copyright infringement."). Moreover, because the Agreement is unambiguous in conferring on Saregama only a two-year sound recording copyright that Saregama no longer owns, the parol evidence rule bars our consideration of all the extrinsic evidence Saregama submitted.[30] See Orkin Exterminating Co., 849 F.2d at 1362.

---

[29] In this light, we also need not address whether the Agreement only covers songs that were created during the two-year term, as Saregama argues, or whether it only covers those that were supplied to Saregama during the two-year term, as the Defendants contend.

[30] Saregama submitted two letters that Shakti sent to Gramophone in 1968; a letter written by a principal of Shakti in May 2009; a xerox copy of a vinyl record label indicating that it contains the BMBH sound recording; an extract from the Indian Register of Copyrights; and testimony by Saregama's corporate representative -- none of which we can consider.

We therefore hold that, under the Agreement, Saregama does not presently own a copyright in the BMBH sound recording and consequently lacks statutory standing to bring this copyright infringement claim.

Accordingly, we AFFIRM the district court's entry of summary judgment in the Defendants' favor.