**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-10223
_____

DISH NETWORK L.L.C.,

                              *Plaintiff-Counter Defendant-Appellee,*

*versus*

GABY FRAIFER,

TELE-CENTER, INC.,

PLANET TELECOM, INC.,

   individually and together,
   d.b.a. UlaiTV,
   d.b.a. PlanetiTV,
   d.b.a. AhlaiTV,

                              *Defendants-Counter Claimants-Appellants.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:16-cv-02549-TPB-CPT
_____

Before BRANCH, ABUDU, and KIDD, Circuit Judges.

KIDD, Circuit Judge:

DISH Network L.L.C. has the exclusive rights to air certain Arabic-language programming in the United States. The defendants owned a service that allowed their customers in the United States to view that programming through set-top boxes without DISH's permission—and without paying DISH. So, DISH sued the defendants for copyright infringement and won at the district court.

In this appeal, the defendants challenge DISH's ownership of the copyrighted material, the district court's determination that the defendants infringed DISH's copyrights, and several rulings that the district court made at the bench trial. We are not persuaded by any of the challenges, so we affirm the district court's judgment.

## I. BACKGROUND

DISH is a television provider that airs, among other things, twenty-one Arabic-language channels ("Protected Channels") in the United States. DISH delivers its programming to millions of subscribers by satellite and by over-the-top services using a public internet infrastructure.

DISH has entered into written agreements with the appropriate networks to exclusively distribute and publicly perform in the United States all programming that aired on the Protected Channels. This appeal concerns DISH's agreements with MBC FZ LLC, a media and broadcasting organization located in the United Arab Emirates ("UAE") that provides five of the Protected

Channels, including MBC1, MBC Drama, MBC Kids/MBC3, MBC Masr, and Al Arabiya.

In June 2016, MBC registered with the United States Copyright Office four audiovisual works that aired on the Protected Channels ("Registered Works"). These Registered Works are episodes of television series produced by MBC and first published in the UAE. They include Sabah Al Khair Ya Arab (Fed. Reg. # PA0001992320), Tasali Ahla Alam (Fed. Reg. # PA0001992317), Saherat Al Janoub (Fed. Reg. # PA0001992319), and Chef Hassan (Fed. Reg. # PA0001992315).

Gaby Fraifer is the founder, sole shareholder, and president of Tele-Center, Inc., and Planet Telecom, Inc. (collectively, the "defendants"). The defendants owned and operated the UlaiTV and AhlaiTV services as well as TCI-Direct.com and Planet-itv.com. UlaiTV and AhlaiTV offered customers access to hundreds of Arabic-language channels, and customers ordered UlaiTV and AhlaiTV products, including set-top boxes ("STBs"), on TCI-Direct.com and Planet-itv.com. By May 3, 2017, the defendants had gone out of business.

In August 2016, DISH sued the defendants for copyright infringement. DISH alleged that it had the exclusive rights to distribute and publicly perform the works that air in the United States on the Protected Channels. According to DISH, the defendants unlawfully captured and retransmitted the Protected Channels to customers of UlaiTV and AhlaiTV services in the United States

through the sale and distribution of STBs and through their services, which were supplemented by CDNs and encoders.

It worked like this: Once the defendants captured live broadcast signals of the Protected Channels, they would "transcode these signals into a format useful for streaming over the [i]nternet, transfer the transcoded content to one or more servers provided, controlled, and maintained by [d]efendants, and then transmit the Protected Channels to users of their [s]ervices through [over-the-top] delivery, including users in the United States."

The defendants transmitted the Protected Channels over the internet to users of their STBs using content delivery networks ("CDNs"), which are groups of internet servers that are distributed throughout the world. The CDNs brought content close to the physical location of each end user, which improved the reliability and stability of the customers' internet viewing experience. The defendants also used encoders to push the Protected Channels onto their CDNs. "Encoders . . . transformed the Protected Channels and the [Registered] Works airing on those channels into formats suited for streaming."

The parties each filed motions for summary judgment regarding the two elements of the test for copyright infringement: (1) DISH's ownership of valid copyrights in the Registered Works; and (2) the defendants' alleged infringement of those copyrights. The district court ruled in DISH's favor on the issue of ownership but found a genuine issue of material fact as to the defendants' alleged infringement.

The case proceeded to a bench trial, and the district court subsequently ruled in favor of DISH, awarding it a permanent injunction and $600,000 in statutory damages, attorney fees, and costs. The district court found that the defendants' use of CDNs and their use of encoders were each sufficient to establish direct copyright infringement.

The defendants appeal the district court's judgment.

## II. STANDARD OF REVIEW

We review the district court's order granting summary judgment de novo. *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011). "In conducting our review, we apply the same legal standards as the district court . . . [and thus] review the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [its] favor." *Id.* (citing *Acevedo v. First Union Nat'l Bank*, 476 F.3d 861, 865 (11th Cir. 2007)).

For a bench trial, we review de novo the district court's conclusions of law, but we review findings of fact for clear error. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020). We review for abuse of discretion the district court's evidentiary rulings, including its "decisions regarding the admissibility of expert testimony and the reliability of an expert opinion." *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–43 (1997)).

### III. DISCUSSION

DISH must first present a prima facie case of copyright infringement. To do so, DISH must show that (1) it owns a valid copyright in the works and (2) the defendants copied protected elements from the works. *Saregama*, 635 F.3d at 1290. We begin with ownership.

### A. *Ownership*

The Copyright Act requires owners of United States works to register their works before instituting an infringement action, 17 U.S.C. § 411(a), but the same is not true for owners of "foreign works." *Kernel Recs. Oy. v. Mosley*, 694 F.3d 1294, 1302 (11th Cir. 2012) (citation omitted). Yet "foreign works can also be registered . . . because Congress has granted substantial litigation benefits to owners of registered works." *Id.* In addition, a certificate of registration, if "made before or within five years after first publication of [a] work [,] . . . constitute[s] prima facie evidence of the validity of [a] copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c); *see Kernel Recs.*, 694 F.3d at 1302 ("A certificate of registration serves as prima facie evidence of copyright validity." (citing 17 U.S.C. § 410(c)). Thus, this statutory presumption of validity applies to registered foreign works. *Id.* Because MBC registered each episode of the Registered Works with the Copyright Office within three months of the work's first publication, MBC was entitled to a statutory presumption of ownership. *See* 17 U.S.C. § 410(c).

24-10223                Opinion of the Court                7

But the statutory presumption of ownership does not end our inquiry because DISH is not the author of the copyrighted works. "If a plaintiff is not the author of the copyrighted work[,] then [the plaintiff] must establish a proprietary right through the chain of title in order to support a valid claim to the copyright." *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 484 (1st Cir. 1985). When evaluating chain of title, courts determine the initial owner of a copyrighted work and then assess whether the initial owner transferred its exclusive or non-exclusive rights to the new owner. *See John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 410 (2d Cir. 2018).

### 1. Initial Ownership

The laws of a work's country of origin determine initial ownership. *Saregama*, 635 F.3d at 1290. The parties agree that UAE copyright law governs, and they cite to UAE Federal Law No. (7) of the Year 2002 Concerning Copyrights and Neighboring Rights.[1] But they disagree as to whether the works should be considered "Joint Works," as the defendants contend, or "Collective Works," as DISH asserts. This distinction matters because it controls whether MBC initially owned the Registered Works. The district court agreed with DISH and found that they were Collective Works.

---

[1] Both parties rely on the same translation of the operative UAE statute. [**R227-3:2–17; 224-4:5–20**] World Intellectual Property Organization [WIPO], *Federal Law No. (7) of the Year 2002 Concerning Copyrights and Neighboring Rights*, WIPO Doc. AE001EN (Jan. 7, 2002), https://www.wipo.int/wipolex/en/legislation/details/7 [https://perma.cc/54MV-GZ8R].

Under Article 1 of UAE copyright law, a Joint Work "is the work compiled by a number of persons whether the lot of each one can be separated or not and which cannot be listed under the collective works." WIPO, *supra* note 1, at 4. Under Article 27 of UAE copyright law:

> A joint author in the audio-visual, audio or visual work can be: 1. The scenarist[;] 2. The one who modifies a literary existing work to an appropriate audio-visual method[;] 3. The dialogist[;] 4. Music composer if he composes it specifically for the work[;] 5. The director if he practi[c]es actual supervision to accomplish the work.

*Id.* at 11. The defendants relied on their expert, UAE intellectual property specialist Bassel El Turk, to argue that under Article 27, an audiovisual work must be a Joint Work as a matter of law because the contributors to an audiovisual work are listed separately. *See id.* In support of this interpretation, the defendants provide screenshots from the opening and closing credits of the Registered Works. The credits list individuals performing the roles set forth in Article 27.

By contrast, DISH maintains that the MBC audiovisual works are Collective Works under UAE copyright law. Under Article 1, a Collective Work is:

> The work compiled by a group of authors under the direction of a natural or legal person who pledges to publish it in his name and under his own supervision. The contribution of authors will be assimilated into the public goal aimed by such a person in such a way that separation and distinction of each author's contribution becomes impossible.

WIPO, *supra* note 1, at 3. Under Article 26, "[t]he natural or legal person who has directed creation of the collective work can practi[c]e alone the author's economic and literary rights in it unless there is an agreement otherwise." *Id.* at 11.

DISH argues that merely identifying individuals along with their titles in the opening and closing credits of the Registered Works does not establish that each individual's contributions can be separated or distinguished, as required by UAE law. DISH supports its position with the declaration of John Richard Whitehead, MBC's Group General Counsel. The declaration states that MBC never intended for the authors' contributions to the Registered Works to be separable or distinct. Moreover, the authors who participated in creating the Registered Works performed overlapping roles, making it impossible to distinguish each author's contributions. DISH further asserts that Article 27 simply identifies persons that "can be" a joint author in an audiovisual work and makes such persons authors as a matter of law.

We agree with DISH. A plain reading of the definition of a Joint Work establishes that a work created by multiple authors may qualify as a Joint Work only if the definition of a Collective Work is not met. *Id.* at 4. The definition of a Collective Work requires that the contributions of the authors cannot "be separated or distinguished." *Id.* at 3–4. In this case, "authors in various departments [including] script writing, literary adaption, dialog, musical composition, graphics, [and] directing . . . contributed to the MBC Works and performed overlapping roles." In this way, each MBC audiovisual work was meant to be viewed as a whole, and it had been marketed in this manner.

The defendants' screenshots do not alter our analysis. For example, Whitehead explained in his declaration that a scripted work is the product of an author who writes a first draft, another who edits the script, and another who makes additional revisions to the script. Despite this, "[t]he credits may only identify the original script writer, although other persons contributed to the creation of the final script," thus making the contributions impossible to separate or distinguish.

The defendants' reading of Article 27 would broaden the definition of a "Joint Work" to encompass all audio-visual works. *See id.* at 4, 11. But the language of Article 27 does not support this blanket categorization. *Id.* at 11. Article 27 uses the phrase "can be" to identify which contributors to a work may be considered joint authors. *Id.* In other words, Article 27 identifies a limited number of roles, such as the scenarist and the dialogist, that *may* qualify as

joint authors when their collaboration meets the definition of a Joint Work. *Id.* To classify all audiovisual works as Joint Works because they have multiple contributors would erase the distinction between Joint Works and Collective Works.

Article 26 of UAE copyright law, which governs Collective Works, vests the rights of each author in the person or entity that directs the creation of the work, unless there is an agreement otherwise. *Id.* Here, MBC directed the creation of the Registered Works and has acquired all the economic and literary rights in the works.

We conclude that DISH has established MBC's initial ownership in the Registered Works pursuant to Article 26.

### 2. Validity of the Registrations

Tangentially, the defendants contend that MBC's United States copyright registration applications are not accurate and cannot be given deference because they identify the Registered Works as "works made for hire," which UAE law does not recognize. Under 17 U.S.C. § 101, a "work made for hire" is created "by an employee [working] within the scope of . . . employment," or where each contributor to a collective work expressly agrees that the work shall be considered a work made for hire in a written and signed instrument.

DISH explains that the copyright registrations properly identify the Registered Works as works made for hire because a copyright applicant is required to submit its application using principles of United States copyright law, even when registering a non-United

States work. Moreover, DISH asserts that any error was not sufficiently material to invalidate the registrations. Finally, DISH points out that this challenge should have been raised as an affirmative defense.

We start and end with the last point: The defendants should have raised this challenge as an affirmative defense and failed to do so. *Roberts v. Gordy*, 877 F.3d 1024, 1028 (11th Cir. 2017) ("[T]he district court's review of validity was . . . the determination of an affirmative defense."); *see also Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996) ("Once the plaintiff produces a certificate of copyright, the burden shifts to the defendant to demonstrate why the claim of copyright is invalid."). "Correspondingly, failure to plead an affirmative defense typically results in waiver of that defense." *Roberts*, 877 F.3d at 1028. We recognize that the defendants moved to amend their answers to include this affirmative defense. But the district court denied the motion, noting that discovery had closed and the motions for summary judgment had been filed. The defendants do not appeal this ruling, so we find no reason to revisit it.

In sum, MBC is entitled to a statutory presumption of ownership under 17 U.S.C. § 410(c) because the Registered Works are considered Collective Works under UAE law and the defendants failed to challenge the validity of the copyright registration as an affirmative defense. We therefore conclude that MBC initially owned the copyrights in the Registered Works, which are validly registered with the United States Copyright Office.

### B. *Transfer of Ownership*

Having determined that MBC initially owned the copyrights in the Registered Works, we must now determine whether MBC properly transferred ownership to DISH. The defendants argue that MBC's copyrights in the Registered Works were not properly transferred to DISH because the agreements between MBC and DISH do not satisfy the requirements of UAE copyright law. DISH counters that MBC and its affiliates properly transferred copyrights that included the exclusive right to publicly perform the Registered Works in the United States. DISH submits that the transfer of copyrights should be assessed under United States law and not UAE law, while the defendants insist that UAE law governs but offer no binding or persuasive authority to support their position. Nor do they offer any supporting arguments besides a single conclusory statement concerning UAE law. "We have long held that an appellant abandons [an issue] when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). As the defendants' argument is perfunctory, they have abandoned their argument that UAE law applies, and we will apply the laws of the United States.

The defendants present several arguments to challenge the district court's determination that the licensing agreements between DISH and MBC properly transferred copyrights under sections 201(d) and 204(a) of the Copyright Act. All of them fail for a

simple reason: The defendants do not have standing to contest the transfer.

In *Imperial Residential Design, Inc. v. Palms Development Group, Inc.*, we held that "the chief purpose of section 204(a) [of the Copyright Act] . . . is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming . . . copyright ownership." 70 F.3d 96, 99 (11th Cir. 1995). Section 204(a) states that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Accordingly, we determined that it would be "unusual and unwarranted to permit a third-party infringer to invoke section 204(a)" where, as here, "there is no dispute between the copyright owner and the transferee about the status of the copyright." *Imperial Residential Design, Inc.*, 70 F.3d at 99.

In this case, there is no dispute about the status of the copyright ownership between MBC, the original copyright owner, and DISH, the transferee. DISH's declaration from an MBC representative affirms that MBC transferred the exclusive rights in question to DISH, so the defendants are precluded from challenging the transfer of copyrights from MBC to DISH.

The defendants' reading would allow alleged third-party infringers to challenge the validity of an otherwise undisputed copyright transfer and would create a perverse incentive for other

copyright infringers to do so as well. We decline to adopt this reading in the absence of clear statutory authority.

### C. *Copyright Infringement*

DISH has established that it owns the copyrights in the Registered Works. We must now determine whether the defendants infringed upon DISH's copyrights—in other words, whether the "defendants copied protected elements from the [works]." *Saregama*, 635 F.3d at 1290 (citation modified).

Under the Copyright Act, infringement occurs when any of the copyright owner's exclusive rights are violated. 17 U.S.C. § 501(a). One of these exclusive rights, "in the case of . . . audiovisual works, [is] to perform the copyrighted work publicly." 17 U.S.C. § 106(4). "To perform . . . a work 'publicly' means . . . [among other things] to transmit . . . a performance . . . of the work . . . to the public, by means of any device or process . . . ." 17 U.S.C. § 101. If the images or sounds comprising a work "are received beyond the place from which they are sent," then the work was transmitted. *Id.* Moreover, "an infringing performance that originates abroad but terminates in the United States constitutes a domestic Copyright Act violation." *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 916 (D.C. Cir. 2018).

As relevant here, direct "[c]opyright infringement is a strict liability offense," so DISH need not "prove unlawful intent or culpability." *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016). By contrast, secondary liability requires culpable conduct: "One infringes contributorily by intentionally

inducing or encouraging direct infringement, . . . and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930–31 (2005) (citation modified).

DISH alleged that the defendants violated its copyrights in two different ways. First, they used CDNs to transmit the Protected Channels that aired the Registered Works to the STBs that they sold to the public. Second, the defendants used encoders to "push" the Registered Works onto the defendants' CDNs for transmission to the STBs.

The district court found each of these methods independently sufficient to prove direct copyright infringement. The defendants appeal these findings and dispute the admissibility of the evidence the district court considered. We agree with the district court that the defendants' use of encoders constitutes direct copyright infringement. Since we affirm the district court as to the use of encoders—an independently sufficient basis to find copyright infringement—we need not reach the issue of whether the defendants' use of CDNs also constituted copyright infringement.

We first address the defendants' challenges to DISH's expert testimony and evidence in support of direct infringement, and then we address their evidentiary challenges to the PayPal and WHOIS records.

### 1. Expert Testimony and Evidence

The district court relied on testimony and evidence from Pascal Metral, DISH's expert witness, to find that the defendants'

conduct constituted direct copyright infringement. On appeal, the defendants challenge the admissibility of this testimony and evidence. First, the defendants argue that Metral was not qualified to testify as an expert. Second, they dispute the admissibility of Metral's accompanying exhibits, including the monitoring reports, the screenshots, and his expert report. And even if we find that this evidence was properly admitted, the defendants argue it was insufficient to show that the Registered Works were transmitted in the United States.

### a. Expert Qualification

Federal Rule of Evidence 702 governs the admissibility of expert testimony.[2] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–95 (1993). In applying Rule 702, our analysis requires us to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as

---

[2] Federal Rule of Evidence 702 states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

> determined by the sort of inquiry man-
> dated in *Daubert*; and (3) the testimony
> assists the trier of fact, through the ap-
> plication of scientific, technical, or spe-
> cialized expertise, to understand the ev-
> idence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). And "[w]hile there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness— they remain distinct concepts and the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260. The defendants focus their arguments on the qualification and reliability requirements.

The defendants argue that Metral's testimony should have been excluded because he was not qualified to testify as an expert. They contend he is an attorney who has no training in computer science or engineering. According to Rule 702, a witness may be qualified based on "knowledge, skill, *experience*, training, or educa- tion." Fed. R. Evid. 702 (emphasis added). If a witness is "relying solely or primarily on experience, then the witness must ex- plain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that expe- rience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quot- ing Fed. R. Evid. 702 advisory committee's note to 2000 amend- ment).

The district court observed that Metral, during his twelve years of experience in antipiracy operations, "supervised the mon- itoring and investigation of copyright infringement on behalf of

the International Broadcaster Coalition Against Piracy ('IBCAP')[,] . . . and he was responsible for investigating not only [the d]efendants' STBs but also more than 100 additional television streaming services on behalf of members of IBCAP." While the district court acknowledged Metral's lack of technical training and that he had done legal work for DISH prior to this case, it still found him qualified to testify as an expert based on his experience

Regarding reliability, the district court found that "Metral's analysis [was] sound, and his conclusions [were] reliable." To determine reliability, courts may assess: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* at 1262 (citation omitted). These factors, however, are "illustrative, not exhaustive" as trial judges must have "considerable leeway" in determining reliability. *Id.*; *Knight ex rel. Kerr v. Miami-Dade County*, 856 F.3d 795, 808 (11th Cir. 2017). Lastly, to be admissible, expert testimony must be helpful to the factfinder. Fed. R. Evid. 702(a).

The district court found Metral's analysis to be straightforward because he "simply identifie[d] television programming that aired over the internet on certain days and times." Metral identified 861 occurrences where the Protected Channels were transmitted to users of the defendants' STBs. To do so, he used the defendants' STBs to watch television programming, took screenshots of programs that he watched, and "identif[ied] the video stream URLs

corresponding [to] the CDNs used in transmitting the Protected Channels to STBs." His findings were reviewed by a security technician for accuracy and "confirmed by the deposition testimony of representatives from the networks that exclusively licensed the Protected Channels to [DISH]." Moreover, "the [n]etworks identified specific, copyrighted audiovisual works exclusively licensed to [DISH] that were depicted in the screenshots or that otherwise aired on the Protected Channels on the dates the channels were transmitted to STBs as indicated in Metral's report."

We find no abuse of discretion in the district court's allowing Metral to testify as an expert. The district court is afforded wide discretion in evaluating the qualification and reliability of experts, *United States v. Costa*, 691 F.2d 1358, 1361 (11th Cir. 1982), and our review of its decisions has a "limited scope," *Rubinstein v. Yehuda*, 38 F.4th 982, 998 (11th Cir. 2022). Here, the district court weighed the flaws that the defendants identified in Metral's qualifications and qualified him nonetheless in light of his extensive experience. We cannot say this was an abuse of discretion, particularly as the defendants cite no caselaw requiring an expert to possess technical training or education. Nor was it improper for the district court to find Metral's straightforward, well-documented analysis to be reliable.

### b. Monitoring Reports and Screenshots

The defendants argue that the district court should have excluded the monitoring reports and screenshots accompanying Metral's testimony because they are inadmissible hearsay created in

24-10223                Opinion of the Court                21

anticipation of litigation. We disagree, because DISH properly laid the foundation to admit these exhibits under the business records exception to the hearsay rule, codified in Federal Rule of Evidence 803(6).[3] Metral authenticated the monitoring reports and screenshots by testifying about how this evidence was acquired and maintained by his team of security analysts in the course of a "standard" collection process, as well as his knowledge of the information contained within the reports and screenshots. *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1267 (11th Cir. 2015) (noting that the authentication burden is light and that if the "court believed [the] testimony, it could have reasonably concluded that the underlying documents were a true and authentic record"). Nor did the defendants show that the exhibits lacked trustworthiness. Thus, the district court properly admitted the monitoring reports and screenshots into evidence over the defendants' hearsay objection.

---

[3] Federal Rule of Evidence 803(6) states: "A record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by — or from information transmitted by — someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."

c. Expert Report

The defendants argue Metral's expert report should have been excluded under Federal Rule of Evidence 1006[4] because he offered no opinion and instead merely summarized "other people's fact gathering work conducted for the purposes of litigation." This argument fails because Federal Rule of Evidence 703 allowed Metral to rely on work performed by others that he supervised. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of *or* personally observed." (emphasis added)); *Knight*, 856 F.3d at 809 (holding an expert properly considered photos and investigative reports prepared by others). Furthermore, the monitoring reports and screenshots upon which Metral relied were properly admitted, as discussed above. Thus, the defendants' challenge to Metral's expert report as an improper Federal Rule of Evidence 1006 summary of this evidence fails.

In sum, we conclude the district court did not abuse its discretion by admitting Metral's expert testimony and the accompanying exhibits.

---

[4] Federal Rule of Evidence 1006 states, in relevant part: "Summaries of Voluminous Materials Admissible as Evidence. The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence."

### d. Transmission in the United States

The defendants argue that Metral's testimony and the accompanying exhibits, even if properly admitted, were insufficient to support the district court's finding of direct copyright infringement because they did not establish that the Registered Works were publicly performed in the United States. The defendants rely on the fact that some of the evidence of the transmissions was captured in Switzerland. But as the district court noted, the defendants "ignore[] the fact that only a fraction of the offending transmissions . . . were captured in Switzerland, while the remainder were captured in Colorado." The majority of the screenshots—and thus the transmissions—were captured in the United States. And even those screenshots that were collected using computers in Switzerland were collected on computers that were using a virtual private network based in Texas. Thus, the screenshots provide strong circumstantial evidence that the defendants were streaming directly to end users physically located in the United States, even when the computers that captured those screenshots were not physically in the United States.

We discern no clear error in the district court's finding that the Registered Works were transmitted in the United States.

### 2. PayPal and WHOIS Records

To prove that the defendants' use of encoders constituted direct copyright infringement, DISH introduced records from PayPal and WHOIS. The defendants contest the admissibility and the import of these records.

### a. PayPal

The defendants argue that the PayPal records, DISH's Exhibits 76 and 77, should have been excluded as irrelevant. The records showed payments by Fraifer's brother to Cetel, a German company that assigned certain IP addresses of the German encoders to the defendants and registered those IP addresses in Fraifer's name. The defendants claim these exhibits do not prove that they used encoders because these payments were made by a third party (Fraifer's brother) around the time that the defendants went out of business after the Registered Works purportedly aired in the United States. DISH counters that Cetel payments were made in February and April of 2017, which was during the time of the defendants' infringement from June 2015 to May 2017. DISH also highlights the evidence from trial showing that the PayPal account was accessed 345 times from the defendants' offices in Tampa, Florida.

As the district court put it, the PayPal records indicated that "somebody in Tampa was logging onto a Pay[P]al account registered to Fraifer's brother . . . and making payments to Cetel." When confronted with this evidence at trial, Fraifer first denied accessing the PayPal account or instructing his brother to do so, but then changed his story to explain that his brother must have accessed the PayPal account when he visited the Tampa offices. The district court found Fraifer's testimony "very difficult to accept as true" considering the records showed that the "Pay[P]al account registered to Fraifer's brother in Canada was accessed 351 times over a

five-month period, and 345 of the 351 logins were from [the] [d]efendants' Tampa offices."

Contrary to the defendants' contentions, the district court found the PayPal records relevant to its findings for two reasons. First, the PayPal records showed that Fraifer's brother made payments to Cetel in February and April of 2017, which was during the infringement period. Second, the district court found the PayPal records relevant in assessing the credibility of Fraifer's testimony.

We find no abuse of discretion in the district court admitting the PayPal records.

### b. WHOIS

The defendants also argue that the WHOIS records—DISH's Exhibits 83 and 84—were improperly admitted over their hearsay and authenticity objections. WHOIS is a publicly available, online database that allows users to "access information regarding domains, including the registrant's name, address, phone number, and e-mail address." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1064 n.22 (9th Cir. 2009). DISH's Exhibit 83 showed that the IP addresses of the German encoders were registered in Fraifer's name and were assigned to Cetel. DISH's Exhibit 84 pertained to the domain name "kakalinka.com." The district court admitted Exhibit 84 after counsel for DISH, at the behest of the court, pulled up the exhibit on the internet to verify, live, that the exhibit matched the website listed—an investigation to which Fraifer did not object. After comparing the two, counsel for Fraifer stated that he would "accept

[counsel for DISH's] representation" that the documents matched each other.

Regarding the hearsay challenge, the WHOIS records fall within Federal Rule of Evidence 803's hearsay exception for directories and other compilations relied upon by the public or by persons in particular occupations. Fed. R. Evid. 803(17).[5] We note in particular that federal trial courts have relied upon such documents to determine the registered party for domains or IP addresses. *See, e.g.*, *Tracfone Wireless, Inc. v. Technopark Co.*, 313 F.R.D. 680, 685 (S.D. Fla. 2016); *Am. Online, Inc. v. aol.org*, 259 F. Supp. 2d 449, 452 n.3 (E.D. Va. 2003); *Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 576 (N.D. Cal. 1999).

As to authenticity, Federal Rule of Evidence 901 permits authentication of a document through the "[t]estimony of a [w]itness with [k]nowledge," or by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(1), (4). DISH's Exhibit 83 was properly authenticated by its "distinctive characteristics," including its domain name, date, and time, which appear on the face of the WHOIS records and identify where and when the document was obtained. *See United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990) (holding authentication may be

---

[5] Federal Rule of Evidence 803(17) states, in relevant part, that "[m]arket quotations, lists, directories, or other compilations that are generally relied upon by the public or by other persons in particular occupations" are excepted from the hearsay prohibition.

established "solely through the use of circumstantial evidence"). At trial, counsel for DISH did not identify who printed the document, although the circumstantial context in the record suggests that counsel was familiar with the person who did. Given this context, we cannot say that the district court abused its discretion in making the implicit ruling that counsel had personal knowledge about when and how the document was printed.

As for DISH's Exhibit 84, the defendants failed to preserve their ability to challenge its admission after their counsel "accepted [DISH's] representation" that the submitted WHOIS record matched the website listed on this exhibit.

Thus, the district court did not abuse its discretion by admitting the WHOIS records.

### c. Operation of Encoders

The defendants alternatively argue that the PayPal and WHOIS records do not show that the defendants themselves operated the encoders located in Germany and Tampa, Florida. Specifically, they argue that "to the extent the[] [encoders] were in use, they were being used by third parties and not [the] [d]efendants."

The defendants focus only on the district court's consideration of the PayPal and WHOIS records in finding that the defendants operated the encoders. But the district court also found that, even without the PayPal and WHOIS records, the remaining evidence showed that the defendants "undertook the volitional act of introducing or 'pushing' [DISH's] copyrighted works onto their system for customer viewing."

The defendants overlook the district court's explanation that "the fact that [the] [d]efendants were 'pushing' [DISH's] copyrighted programming . . . is established by [the] [d]efendants' emails and witness testimony." The district court considered email communications from Fraifer to Verizon on the use of the Germany-based encoders between February 25, 2016, and May 4, 2016. It also considered the deposition testimony of Sajid Maqsood, a consultant that the defendants retained in 2015, that confirmed the use of approximately 21 to 25 encoders located in Germany. And it considered email communications between Verizon and Adib Sfeir, one of the defendants' employees, on the use of encoders located in Tampa, Florida. Notably, the defendants do not challenge these email communications or the witness testimony the district court considered.

Based on this totality of the evidence, the district court did not clearly err in finding that the defendants operated the encoders.

## IV. CONCLUSION

The district court's judgment is **AFFIRMED**.